(No. 62084.—

*In re* GARY RICHARD WILLIAMS, Attorney, Respondent.

*Opinion filed January 23, 1986.*

106

SIMON, J., took no part.

Theresa M. Gronkiewicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte and David J. Walker, of counsel), for respondent.

CHIEF JUSTICE CLARK delivered the opinion of the court:

This is a proceeding under our Rule 761 (94 Ill. 2d R. 761) to discipline the respondent, Gary R. Williams, a member of the Illinois bar. This cause is before us because the Administrator of the Attorney Registration and Disciplinary Commission has filed exceptions to the report of the Review Board.

On March 18, 1983, the respondent was convicted by a jury in the United States District Court for the Northern District of Illinois, Eastern Division, on mail-fraud charges for participating in a scheme to defraud an insurance company. On May 4, 1983, the respondent was placed on four years' probation, to run concurrently, for each of the three counts of mail fraud for which he was convicted. It was further ordered that as a condition of probation the respondent was to participate in community service work for 300 hours at the discretion of the probation department. The respondent was also ordered to make restitution, with the amount to be determined by the probation department. His conviction was affirmed on appeal. *United States v. Williams* (7th Cir. 1984), 738 F.2d 172.

Following the procedure set forth in Rule 761, the Administrator filed a petition with this court alleging that the respondent had been convicted of three counts of mail fraud and requesting that this court suspend the respondent from the practice of law. On October 5, 1983, the respondent was suspended until further order of our court. The Administrator then filed a one-count complaint before the Hearing Board; a hearing was subsequently held. The Hearing Board filed a report in which it made findings of fact and conclusions of law. It concluded that the respondent engaged in illegal conduct which involved moral turpitude, a violation of Disciplinary Rule 1—102(a)(3) of the Code of Professional Responsibility (87 Ill. 2d R. 1—102(a)(3)); conduct which involved dishonesty, fraud, deceit or misrepresentation, a violation of Disciplinary Rule 1—102(a)(4) of the Code of Professional Responsibility (87 Ill. 2d R. 1—102(a)(4)); and conduct that was prejudicial to the administration of justice, a violation of Disciplinary Rule 1—102(a)(5) of the Code of Professional Responsibility (87 Ill. 2d R. 1—102(a)(5)). The Board recommended that the respondent be suspended from the practice of law for a period of four years from October 5, 1983; that the suspension be stayed effective January 1, 1985; and that the respondent be placed on probation for a period to run concurrently with his Federal probation. The Board also made further recommendations with respect to the respondent's probation.

The Administrator filed exceptions with the Review Board to certain findings of the Hearing Board as well as to the Hearing Board's recommendation for discipline. The Review Board heard oral argument and filed a report affirming the findings of the Hearing Board. However, it recommended that the respondent be suspended from the practice of law for two years from October 5, 1983, or until he was released from Federal probation,

depending on whichever occurred first.

The matter is now before us upon the Administrator's exceptions to the report of the Review Board.

The Administrator has presented three issues for review, namely: (1) whether the Hearing Board erred in admitting certain evidence over the objection that it was hearsay and irrelevant; (2) whether the findings of the hearing and review boards were contrary to the judgment of conviction; and (3) whether the Review Board erred in its recommendation of discipline.

Before we begin our analysis of the issues, we believe that it would be helpful in understanding this case if additional facts were set forth. As stated earlier, the respondent was convicted of three counts of mail fraud. His conviction stemmed from a false claim he made to his insurance company that his car had been stolen. The respondent was tried along with a codefendant, Charles Vervlied. Like the respondent, Vervlied was charged and convicted of three counts of mail fraud.

The evidence at the respondent's trial established that the respondent caused his car to be delivered to Vervlied, who then sold it to an undercover Federal Bureau of Investigation (FBI) agent. The evidence showed that several days after the FBI agent had purchased the car, the respondent called the Orland Park police and reported that it had just been stolen from the Orland Square Shopping Center. When the police arrived at the shopping center, the respondent showed them where he had allegedly parked his car and then accompanied the police to the station house, where a written report was made and signed by the respondent. The respondent later mailed a claim for the loss of his car to his insurance company, notifying them of the alleged theft and of the police report that had been filed. The respondent received $10,410.41 on his claim.

Although the respondent did not testify at his trial,

his codefendant did. Vervlied's testimony regarding the respondent was to the effect that the respondent was not involved with him in the sale of the car. According to Vervlied, Bob Berrant (or Berent), an alley mechanic who had died before the trial, and he stole cars which belonged to Berrant's customers. Vervlied testified that after accepting cars to work on, Berrant would give the car to Vervlied to sell. According to Vervlied, Berrant's customers would not be told that their car had been stolen until a few days after Vervlied had sold that customer's car. Therefore, Vervlied's position was that although he had possessed and sold stolen cars he was not involved in a scheme to defraud an insurance company.

The respondent's position at the trial was that his car had been stolen while being repaired, that it had been transferred without his knowledge to Vervlied, and that he did not scheme to defraud his insurance company.

At the respondent's criminal trial, the jury was instructed that the government had to prove that a scheme or artifice to defraud was intentionally devised and that the respondent and Vervlied knowingly used or caused the mails to be used in furtherance of the scheme. The court also told the jury that a member of the scheme did not need to know all the details of the scheme nor did he need to know the means that would be used to accomplish the scheme. In addition, the judge instructed the jury that the government did not have to establish that the respondent and Vervlied knew each other's identity, had direct contact with each other, or that they had any express agreement. The judge did tell the jury, however, that the government had to prove that the respondent and Vervlied were aware of the common purpose; that they knew of each other's existence; and that they were willing participants who had the intent to advance the purpose of the scheme.

The Federal jury rejected the respondent's and

Vervlied's positions and found that they were involved in a scheme to defraud the insurance company and used the mails to do so.

The respondent's position before the Hearing Board was similar to his position at trial. The respondent told the Hearing Board that because his car needed repairs he had given it to Bob Berrant for the necessary work. He also told the Board that Berrant called him a few days later and then came to his office. When Berrant arrived at the respondent's office, he was not driving respondent's car. In an offer of proof, the respondent stated that Berrant told him that his car had been stolen when Berrant had used it to run an errand to the Orland Square Shopping Mall. The respondent further testified that he and Berrant went to the Orland Square Shopping Mall and that he searched the parking lot for his car. He told the Hearing Board that when he was unable to locate his car he went into a store to call the police. He also stated that when he returned from calling the police Berrant was gone. The police arrived shortly thereafter, at which time he told the police that his car was stolen while he had been shopping.

Having set forth these additional facts, we now turn to the first issue the Administrator has asked us to decide, namely, whether the Hearing Board erred in admitting a transcript of Vervlied's prior testimony into evidence.

The respondent and the Administrator attempted to depose Vervlied prior to the hearing. Vervlied appeared for the deposition but asserted his fifth amendment right. Neither the respondent nor the Administrator took further action to obtain Vervlied's appearance before the Hearing Board. At the hearing, the respondent offered a transcript of Vervlied's testimony at the criminal trial. The Administrator objected on the grounds that the testimony was irrelevant, as well as hearsay. Af-

ter argument by the respondent and the Administrator, a transcript of the entire trial was moved into evidence by the respondent and admitted into evidence by the panel of the Hearing Board.

We begin by noting that the respondent was convicted of an offense which involved moral turpitude. (*In re Needham* (1936), 364 Ill. 65.) For the purposes of disciplinary proceedings, his conviction is conclusive evidence of his guilt and grounds for the imposition of discipline. (*In re Callas* (1980), 82 Ill. 2d 6, 14.) We will not go behind his conviction (*In re Scott* (1983), 98 Ill. 2d 9, 16) since we are not here to relitigate issues of guilt. See *In re Wigoda* (1979), 77 Ill. 2d 154, 160.

Additionally, common law rules of evidence apply to disciplinary proceedings, including the hearsay rule. (*In re Silvern* (1982), 92 Ill. 2d 188, 196.) When the respondent offered the transcript of the Federal court testimony at his hearing his counsel stated: "The only question that we desired to pose to Mr. Vervlied was whether the questions and answers which were given at the time of trial *** were in fact the answers that would be given if we asked the same questions." Later respondent's counsel argued that Vervlied's testimony at the Federal trial should be admitted because the respondent was not conceding that he was guilty of the mail fraud and also because the admission of Vervlied's testimony would be just not only for the respondent but for the system as well.

The statements by respondent's counsel to the Hearing Board indicate that he offered the transcript of Vervlied's prior testimony for the truth of the matters asserted in it. We can think of no other reason for the respondent to introduce the transcript of Vervlied's prior testimony except to attempt to show that the respondent was innocent of the scheme of which he was charged and convicted by a jury. Clearly, the jury rejected Vervlied's

testimony. We are not here to retry the respondent's case; rather, we are here to determine the discipline the respondent is to receive for his conduct.

In *In re Silvern* (1982), 92 Ill. 2d 188, 196, this court stated "that technical rules of evidence, including the hearsay rule, *need not* be mechanically followed in attorney discipline cases." (Emphasis added.) The respondent relies on *Silvern* for the proposition that we should not apply the hearsay rule in this case. The respondent's reliance is misplaced. The hearsay evidence admitted in *Silvern* was very different from the hearsay evidence admitted in the case at bar.

In *Silvern*, the Hearing Board admitted into evidence various letters from civic and cultural leaders for the purpose of corroborating Silvern's testimony regarding his community activities, contributions and reputation in the community. The Administrator objected, contending that the letters were hearsay. This court held that the hearing panel had the discretion to admit the letters, noting that the letters were of minor significance to the petitioner's case; that over a dozen letters had been admitted; that the cost of bringing the authors to Chicago to testify would have been prohibitive; and, finally, that the Administrator did not dispute the information contained in the letters.

In that case, the evidence which was admitted went to the respondent's character; it did not contradict the facts established in his criminal trial. The letters were not used in an attempt to establish that Silvern was innocent. Rather, the letters were introduced to show that the attorney was again fit to practice law. Such is not true in the present case. In this case, the evidence which was admitted was contrary to the factual findings which the jury had to necessarily make in the criminal trial to reach the verdict which it reached.

While the testimony at a criminal trial may be admis-

sible in certain cases, in the case at bar the evidence admitted was hearsay and should not have been admitted. (See *In re Melin* (1951), 410 Ill. 332, 336.) In addition to being hearsay, the testimony was also irrelevant since it related to the issue of respondent's guilt.

The second issue presented is whether the findings of the hearing and review boards were contrary to the judgment of conviction. We believe they were.

The hearing and review boards found that the respondent believed his car had been stolen from the Orland Square Shopping Mall and that his only fraud was misrepresenting to the police and the insurance company the circumstances under which his car was stolen.

As stated earlier, the respondent's conviction is conclusive evidence of his guilt. (*In re Callas* (1980), 82 Ill. 2d 6, 14.) The respondent was indicted and found guilty of using the mail in a scheme to defraud his insurance company. He was not charged and convicted for filing a false police report. The Boards' findings were contrary to the verdict reached by the jury in the respondent's criminal trial.

The third and final issue which we have been asked to address is whether the Review Board erred in its recommendation of discipline.

The Review Board recommended that the respondent be suspended from the practice of law for two years from October 5, 1983, or until he was released from Federal probation, depending on whichever occurred first. Although we may consider the recommendations of the hearing and review boards, we have final responsibility for imposing discipline upon an attorney. (*In re Lenz* (1985), 108 Ill. 2d 445, 450.) Therefore, the real issue before us is what discipline is appropriate.

The purpose of our disciplinary proceedings is to safeguard the public, maintain the integrity of the profession, and protect the administration of justice from re-

proach. (*In re Lenz* (1985), 108 Ill. 2d 445, 450-51; *In re Goldstein* (1984), 103 Ill. 2d 123, 131.) In determining what discipline is appropriate, we consider the circumstances of each case and are mindful of the discipline which has been deemed appropriate under similar circumstances. *In re Lenz* (1985), 108 Ill. 2d 445.

The Administrator believes that the respondent should be suspended from the practice of law for three years and cites *In re Sherre* (1977), 68 Ill. 2d 56, and *In re Grossgold* (1974), 58 Ill. 2d 9, in support of this position.

In *In re Sherre*, the respondent was convicted of mail fraud. Sherre, along with others, formed an insurance company. The insurance company entered into a trust agreement, and Sherre became the attorney for the trust. Appraisal letters, balance sheets and financial statements falsely stating the true condition of the trust were created. These documents were then mailed to various State departments of insurance, insurance agents, and insurance brokers. Sherre contended that he knew nothing of the misrepresentations. This court noted that although no financial loss appeared to have been suffered by anyone, there was a potential for substantial loss and suspended Sherre from the practice of law for three years.

In *In re Grossgold*, the respondent was also convicted of mail fraud. In that case, the respondent's brother-in-law started the Whitehall Insurance Company. The evidence at Grossgold's trial established that Grossgold or his brother-in-law would call a garage owner and make arrangements for damaged cars insured by Whitehall to be repaired. The garage owner, who was working with Grossgold and his brother-in-law, would provide a written estimate and would then repair the car at a cost lower than the estimate. They would then send the written estimate to the insurer of the person whose car had

collided with the Whitehall insured, along with a subrogation claim written by Grossgold. Whitehall would then be paid the amount stated in the written estimate. This court stated that Grossgold's role in the scheme was minor, and since his misconduct was the only mark on his professional record, he was suspended for three years.

In response to the cases cited by the Administrator, the respondent argued that the facts of his case are "markedly less severe" than the facts in *Sherre* and *Grossgold*. In an attempt to distinguish those cases the respondent stated that his acts of misconduct were "done entirely independently of his role as an attorney."

Respondent's contention that his misconduct should be looked upon in a different light because it was "done entirely independently of his role as an attorney" is mistaken. "The fraudulent act of an attorney in his own behalf is no less reprehensible than acting on behalf of a client. In each case he seeks personal gain, directly or indirectly, to the detriment of honesty." *In re Teitelbaum* (1958), 13 Ill. 2d 586, 590.

We agree with the Administrator that *In re Sherre* and *In re Grossgold* are similar to the present case. However, in determining what discipline is appropriate in a given case we not only consider the discipline deemed appropriate in similar cases and the seriousness of the misconduct in the case before us, we also consider various mitigating factors. (*In re Lenz* (1985), 108 Ill. 2d 445, 453.) In the past we have stated that the mitigating factors we consider "include the length of time in practice, previous misconduct, whether and when restitution is made if it is owing, community service, *pro bono* legal work, and the testimony of character witnesses and professional colleagues." 108 Ill. 2d 445, 453-54.

Therefore, we will briefly consider such factors. The respondent has been licensed to practice law in Illinois since November 16, 1970. The misconduct involved in

the present case is the only mark on his record.

The respondent was ordered to make restitution to the insurance company. The respondent testified at his hearing that the amount of restitution had not been set by the probation department, that the department had asked him to prepare a letter regarding restitution, which he did, that the probation department sent a letter to the insurance company, and that the company had not responded. Therefore, it appears that the respondent had done all that had been asked of him up until the hearing, at least, regarding restitution.

Part of the respondent's condition of probation was that he participate in community service work for 300 hours. At the time of the respondent's hearing he had participated in 250-260 hours of such work.

The respondent also told the Hearing Board that he had been involved for a period of two to three years in *pro bono* programs. The respondent described his *pro bono* work with a "Prisoners and Parole type of committee" as follows:

> "[T]here were various prisoners who [were] convicted and imprisoned. And they would write letters to the Bar Association to have *** attorneys do [appellate] work and post-trial motions.
>
> And I did that on a voluntary basis."

He went on to state that he was also involved with the Chicago Bar Association's lawyer-referral program. In this program he performed in-court services in the local fifth and sixth districts, helping to clear the dockets of traffic and misdemeanor matters.

In addition to the *pro bono* work set forth, the respondent also told the Hearing Board that he took cases knowing he would receive no compensation for his work.

The respondent presented the testimony of eight character witnesses. Among these eight witnesses were two circuit court judges, a suburban mayor, a member of

the Illinois House of Representatives, and two attorneys. They all testified to the respondent's reputation for honesty and integrity.

We also note that the respondent has not practiced law since his suspension. In addition, after he was suspended from the practice of law he wrote letters to all his client's notifying them that he could no longer represent them. He also had the name of his law firm changed and had his name removed from the stationary, the checks and all directories.

In the past we have stated that "[a]ny act which evidences want of professional or personal honesty *** affords sufficient grounds for disbarment." (*In re Melin* (1951), 410 Ill. 332, 337.) It has not been recommended that the respondent be disbarred in this case, and we are not disposed to disbar him on the basis of the record before us.

The respondent has been licensed to practice law in this State since November 16, 1970. This is the only mark on the respondent's record. He is held in high regard by his peers and has attempted to carry out the conditions of his Federal court probation. However, the respondent's conduct brought the legal profession into disrepute and was unbecoming a member of our profession. Therefore, he must be disciplined. In view of his unblemished record and his actions after this court's order of October 5, 1983, suspending him from the practice of law, we believe the objectives of disciplinary proceedings in this case are adequately served by following the recommendation of the Review Board, which was that the respondent be suspended from the practice of law for two years from October 5, 1983, or until he was released from Federal probation, depending on whichever occurred first. The respondent has been suspended for more than two years from October 5, 1983. In addition, the respondent asserted that he has been released

from Federal probation. Therefore, the respondent's suspension from the practice of law will end upon the filing of this opinion.

*Respondent suspended.*

JUSTICE SIMON took no part in the consideration or decision of this case.