(No. 65343.

*In re* VICTOR F. CIARDELLI, Attorney, Respondent.

*Opinion filed October 5, 1987.*

235

WARD and CUNNINGHAM, JJ., took no part.

Thomas P. Sukowicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Leonard M. Ring & Associates, of Chicago (Leonard M. Ring and Leslie J. Rosen, of counsel), for respondent.

JUSTICE RYAN delivered the opinion of the court:

In this disciplinary proceeding respondent, Victor F. Ciardelli, on February 3, 1986, was suspended from the practice of law in Illinois until further order of the court,

pursuant to our Rule 761(b) (107 Ill. 2d R. 761(b)). The basis for the suspension was respondent's conviction pursuant to pleas of guilty to charges in a two-count information in the United States District Court for the District of Arizona. Thereafter, the Administrator of the Attorney Registration and Disciplinary Commission filed a complaint with the Hearing Board, pursuant to Rule 761(d) (107 Ill. 2d R. 761(d)), and requested that the matter be set for a hearing and that the hearing panel make findings of fact and conclusions of law and recommendations as to such discipline as may be warranted. The Hearing Board recommended that the respondent be suspended from the practice of law for a period of three years, beginning February 4, 1986, the day respondent had received notice of the interim suspension under Rule 761(b). The respondent filed exceptions to the report and recommendation of the Hearing Board with the Review Board. The Review Board affirmed the findings of fact and conclusions of law of the Hearing Board; however, it recommended that the respondent be suspended from the practice of law for one year, effective February 3, 1986. Leave was granted to the Administrator to file in this court exceptions to the recommendations of the Review Board, pursuant to Rule 753(e)(6) (107 Ill. 2d R. 753(e)(6)).

Respondent was admitted to the practice of law in this State on May 19, 1960. He served as an assistant State's Attorney of Cook County from 1961 to June of 1964, when he entered the private practice of law. His practice consisted primarily of trying personal injury and criminal cases, many of which were referred to him for trial by other lawyers. Gradually, his practice became primarily criminal.

Respondent met Harold Garmany when he was retained to represent Garmany "in the early 1970's" for a charge involving an automobile or automobile parts. The

respondent, in his testimony, was not sure which. About three years later, around 1975, Garmany was indicted in a Federal court in Texas on a drug-related charge. Respondent defended Garmany and the trial resulted in a conviction and a five-year sentence. Respondent next heard from Garmany when he received a telephone call from him from Atlanta, Georgia, in 1980. Garmany wanted the respondent to come to Atlanta and represent a friend. He went to Atlanta as requested but did not take the case. Before returning to Chicago, respondent and Garmany visited an attorney by the name of Steven Kermish, who had previously consulted with the respondent in Chicago in connection with a motion for a new trial for Garmany in the drug conviction case. Respondent testified that he was not told, when he was in Atlanta, and he did not know at that time that Garmany was on parole. Late in 1981 or early 1982, respondent received a telephone call from Kermish, who asked him if he knew that Garmany was on parole. When respondent said that he did not, Kermish said that he had had a call from a parole officer who said that Garmany had not been reporting to him as required. Respondent then called Garmany by telephone and also saw him personally in February 1982, and advised him to turn himself in. He did not, however, advise the Federal authorities of Garmany's whereabouts.

Late in 1980, respondent and two others purchased a building at 19 West Jackson Boulevard in Chicago. In early 1981, respondent had a conversation with Garmany about remodeling the building. Garmany offered to loan the respondent and his partners money for that purpose. Later in 1981, Garmany again offered to loan respondent the money to remodel the building. Because of Garmany's past illegal activities, respondent asked him if the money was "legitimate money." Garmany assured him that it was and loaned respondent and his partners

$550,000 at 12% interest. One of respondent's partners had been able to obtain an offer of a loan for that amount at 12½% interest with two or three "discount points," payable at closing. Respondent did not disclose the source of the loan they obtained from Garmany to his partners. The funds respondent received came from money that had been obtained illegally by Garmany, taken out of the country and deposited in foreign banks and then channeled back to the respondent through a foreign bank. Also, after Garmany was arrested for parole violation, the respondent visited him several times in a Federal penitentiary in Alabama, and in January 1983, the respondent advised Kermish to obtain a loan from Garmany to assist in hiding and concealing the source of Garmany's income.

These facts were the basis for a two-count Federal information against the respondent filed in the United States District Court in Arizona. The first count charged the respondent with harboring and concealing Garmany, a fugitive. The second count charged the respondent with conspiring to defraud an agency of the United States, the Customs Service of the Treasury Department, in the governmental function of collection of data and reports of the exportation and importation of currency for use with criminal and regulatory investigations and proceedings. The activity of the conspiracy was referred to generally in the briefs as "laundering illegal funds." The information charged that the profits from Garmany's activities were surreptitiously transported out of the United States in order to evade reporting the exportation of money. It was charged that these funds were deposited in foreign banks in accounts in the names of various corporate entities and that the money was then brought back into the United States in the guise of loans. It was alleged that in the furtherance of this conspiracy the respondent procured the loan of

$500,000 for the 19 West Jackson building partnership in Chicago and that the respondent advised Kermish to procure a loan to assist in hiding and concealing the true source of Garmany's income.

Respondent entered pleas of guilty to both counts of the information on October 21, 1985. He was sentenced to 12 months' imprisonment and fined $10,000 as to count I. As to count II, respondent was placed on supervised probation for five years, to commence upon his release from imprisonment under count I, and to perform 400 hours of community service. The commitment order was later amended to authorize the respondent to participate in a work release program at the Metropolitan Correction Center in Chicago.

This court has held in many cases that the conviction of a crime involving moral turpitude is conclusive evidence of the respondent's guilt and that grounds for the imposition of discipline exist. These cases also hold that this court will not go behind the record of conviction. (*In re Williams* (1986), 111 Ill. 2d 105, 113; *In re Scott* (1983), 98 Ill. 2d 9, 16; *In re Callas* (1980), 82 Ill. 2d 6, 14; *In re Scherre* (1977), 68 Ill. 2d 56, 61; *In re Andros* (1976), 64 Ill. 2d 419, 423; *In re Crane* (1961), 23 Ill. 2d 398, 400.) The respondent was charged in both counts of the criminal information with crimes involving moral turpitude. Thus the judgments of conviction are conclusive evidence not only of the respondent's guilt but also that discipline is warranted.

This court has also held that while a conviction is conclusive evidence, it does not preclude the consideration of other evidence for the purpose of determining the appropriate disciplinary action, since "a respondent is being disciplined not because of his conviction but because of his conduct. The actual conduct itself is certainly relevant to a determination of the appropriate discipline to be accorded." (*In re Crane* (1961), 23 Ill. 2d 398, 400;

see also *In re Scott* (1983), 98 Ill. 2d 9, 16; *In re Andros* (1976), 64 Ill. 2d 419, 423-24.) However, in presenting evidence in a disciplinary hearing to show the nature of respondent's conduct, which may be relevant to a determination of the discipline to be imposed, the respondent may not be permitted to impeach the factual allegation of the charges to which he pleaded guilty. In *In re Scott* this court would not go behind the conviction of the respondent to determine that the evidence in fact supported only the proof of one of several charges.

The information in our case contained specific allegations as to the conduct of the respondent. He entered pleas of guilty to the criminal charges "as charged in counts one and two of the information." The information charged the respondent did "knowingly, willfully and unlawfully" harbor and conceal Garmany after the respondent "had notice and knowledge of the fact that a warrant had been issued" for the arrest of Garmany. Respondent now argues that he did not know he had an obligation to inform the Federal authorities of the whereabouts of Garmany. He asserts that after being confronted with the government's interpretation of the law "he elected to plead guilty to count One of the information and not go through a trial." He asserts that his crime "consisted of a technical violation of a statute and no more." We do not agree. The charges of harboring and concealing a fugitive as contained in count I charged more than the mere failure to notify. The plea of guilty was a knowing and frank admission that the respondent had committed the offense and was guilty of the conduct alleged in the information. Respondent took advantage of whatever benefits may have been forthcoming from his guilty plea by way of a bargained-for sentence or leniency extended by the court in the criminal case. He cannot now repudiate the admissions of his plea and be permitted to say that he should here be given further

consideration because he really did not admit the allegations in the information but was only "technically" guilty of a crime.

As to count II, the respondent, in his testimony before the hearing panel, professed not to know the source of the money that was loaned to him and his partners through Garmany. However, the information, in count II, charged the respondent as a co-conspirator with others with "knowingly, willfully and unlawfully" defrauding the Customs Service of the Treasury Department in its function of the collection of data and reports on the exportation and importation of currency in excess of $5,000. Also, the respondent testified before the hearing panel that he never told Kermish to get a loan from Garmany. However, count II specifically alleged that as a part of the conspiracy the respondent advised Kermish "to obtain a loan from coconspirator Harold Jerry Garmany in order to assist Garmany in hiding and concealing the true source of Garmany's income." When reminded that he had pleaded guilty to this allegation, respondent told the hearing panel he pleaded guilty to it "because that was what was typed up in the indictment. And then I caught it. That was a mistake—."

In count II, as in count I, we cannot permit the respondent to impeach or repudiate the confessions and admissions of his plea of guilty. The Hearing Board noted that the respondent "knowingly and willingly" pleaded guilty to these crimes and stated it could not go behind these convictions and retry the guilt or innocence of the respondent. The Hearing Board also noted that the respondent had practiced criminal law for 26 years, that he was aware of the criminal activities of Garmany and that he was suspicious of the source of the money for the loan as evidenced by his question to Garmany concerning the legitimacy of the funds. All of this tended to refute the claim of innocent involvement put forth by

the respondent. Although the Review Board did not concur in the Hearing Board's recommendation as to the discipline to be imposed, it did affirm the findings of fact and conclusions of law of the Hearing Board, and we do likewise at this time.

In recommending that the respondent be suspended from the practice of law for three years, the Hearing Board considered the fact that the respondent had a good reputation in the community and that his original sentence of one year's incarceration was reduced to one year at the work release program. Character evidence on behalf of the respondent was given by Federal and State judges, both present and former, as well as other attorneys who were associated with respondent when he was an assistant State's Attorney and those who were acquainted with him as a practicing attorney. All spoke highly of his ability and of his character and fitness to practice law.

In groping for consistency in the imposition of sanctions, we search for similar or contrasting cases against which to measure the respondent's infractions. Here, the Administrator urges the similarity of *In re Reagan* (1986), 112 Ill. 2d 511, and *In re Scherre* (1977), 68 Ill. 2d 56, as a basis for the recommendation that this court affirm the recommendation of the Hearing Board that the respondent be suspended for three years. Respondent disputes the similarities of *Reagan* and *Scherre*. Although both of those cases involve participation by an attorney in schemes to defraud, it is difficult to compare the conduct of the attorneys in those cases with that of respondent here.

An attorney engaging in the practice of criminal law treads a path fraught with peril. A person charged with a crime is entitled to receive the attorney's best efforts to the end that effective legal representation is given. But legal representation is the extent of the attorney's

obligation. In the representation of a criminal defendant an attorney need not, and indeed must not, perform services for the client which violate the criminal law, such as harboring or concealing a client or ex-client known to be a fugitive. Also, it is extremely unwise for an attorney, knowing the criminal proclivity of a client, to enter into business transactions with him such as borrowing money from him. When such business transactions become a part of an illegal scheme, such as we have in this case, the attorney's involvement is more than unwise. It is strictly prohibited. Also, an attorney advising another to procure a loan from a former criminal client to further an illegal conspiracy is never to be countenanced.

It is the part of the genius of our profession that attorneys have been able to competently and effectively represent criminal clients objectively and abstractly without personal involvement, and without incurring the disapprobation society tends to cast upon those convicted of crimes. However, when an attorney exceeds the accepted bounds of legal representation and enters the area of personal involvement in the criminal client's illegal activities, the image of the profession is severely damaged and the public, in leveling its condemnations, understandably finds it difficult to distinguish between the criminal and his attorney. We view the conduct of the respondent totally unacceptable. Were it not for several mitigating circumstances, we would consider disbarment to be the appropriate sanction. However, we have here an attorney who was engaged primarily in the practice of criminal law for 26 years, and the charges in this case appear to be his only violation of ethical standards. He has participated in bar association activities and has been active in *pro bono* programs of the bar association, and he has been a panelist in the Federal court's *pro bono* criminal defense program. He and his wife have been active in their church and several charitable organi-

zations. In addition, the testimony of the judges and attorneys as to his character, reputation and fitness to practice law is quite persuasive. We therefore feel that disbarment in this case would be inappropriate, and that the recommendation of the Hearing Board should be the sanction. We therefore suspend the respondent from the practice of law for three years, beginning February 4, 1986.

*Respondent suspended.*

WARD and CUNNINGHAM, JJ., took no part in the consideration or decision of this case.