(No. 69542.—

*In re* WILLIAM THEODORE LEWIS, JR., Attorney,
Respondent.

*Opinion filed October 4, 1990.*

312

314

Daniel Drake, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

William Ted Lewis, of Springfield, respondent *pro se.*

JUSTICE CALVO delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a second-amended complaint setting forth 23 counts against respondent, at-

torney William Theodore Lewis, Jr. The complaint alleged respondent committed various acts of misconduct, in violation of the Code of Professional Responsibility (Code), in his representation of several clients. After a hearing, the Hearing Board, on April 17, 1989, found that sufficient evidence existed to support five of the counts. The Hearing Board recommended the following disciplinary action on those five counts: (1) count I—60-day suspension; (2) count II—six-month suspension; (3) count XVII—three-month suspension; (4) count XXI—one-year suspension; and (5) count XXIII—six-month suspension. Both the Administrator and respondent filed exceptions to the report of the Hearing Board. The Review Board concurred with the findings of fact and conclusions of law of the Hearing Board, but recommended respondent be suspended for a total of 18 months. One member of the Review Board dissented, recommending respondent be disbarred. The Administrator filed exceptions to the report of the Review Board.

The Administrator raises two issues before this court. The Administrator argues that respondent's proven misconduct warrants disbarment. The Administrator also contends count XXII was proven by clear and convincing evidence and therefore the Hearing Board and Review Board erred in dismissing count XXII. Respondent disputes some of the findings and conclusions of the Hearing Board, argues that count XXII was properly dismissed, and contends his conduct warrants only censure. Before addressing these issues, we must set forth the intricate facts involved in each of the counts.

## Count I

In June 1981, Nancy Fruitts met with and hired respondent to represent her concerning the modification of a judgment for dissolution of marriage. In particular, Fruitts sought to modify the child support her former

husband paid. At the meeting with respondent, Fruitts paid respondent a $500 retainer. Fruitts testified respondent advised her the $500 would constitute his entire fee for handling the case. Fruitts also testified respondent informed her the matter would take less than six months to conclude.

In February 1982, Fruitts had not received a modification of the judgment. That same month she terminated her attorney-client relationship with respondent and filed a complaint against him with the ARDC. On February 24, 1982, respondent filed with the ARDC an answer to Fruitts' complaint.

In a billing statement sent to Fruitts and dated March 17, 1982, respondent charged Fruitts $2,146.35 for legal fees and expenses he allegedly incurred on her behalf. Respondent testified this billing statement was the first such statement he sent to Fruitts. The billing statement did not credit Fruitts for the $500 she had previously paid him.

The billing statement included time charges to the exact minute. Respondent testified he did not have time records for some of the charges; he derived those charges from memory. Nancy Fruitts, Donald A. LoBue (the attorney for Fruitts' former husband), and Philip Howe (general counsel for the Illinois Secretary of State) testified that some of the meetings and telephone calls itemized on the billing statement did not occur. They also testified that shorter periods of time were spent on certain telephone calls and meetings than the periods of time listed by respondent on the billing statement. In addition, the billing statement included a charge for 2 hours and 22 minutes which respondent allegedly spent reviewing Fruitts' ARDC complaint against him. The statement also contained a 2 hour and 54 minute charge for respondent's preparation of an answer to the complaint. Respondent's answer was two pages in length.

In a letter dated July 22, 1982, the Administrator informed respondent, through respondent's attorney, that the Inquiry Board had voted a complaint against him. Respondent then sent Fruitts a billing statement, dated July 6, 1983, for $2,350. Again, respondent did not credit Fruitts for the $500 retainer she had given him. The bottom of this billing statement contained the following note:

> "Please make arrangements to pay this bill *immediately*. The content of this bill and the amount of these current charges have been approved, and I will take prompt action to settle this account." (Emphasis in original.)

A subsequent billing statement dated July 18, 1983, again reflected charges totaling $2,350, but credited Fruitts for the $500 she had paid, thus leaving Fruitts owing a balance of $1,850. The bottom of this billing statement contained the following note:

> "Please make arrangements to pay this bill *immediately*. The content of this bill and the amount of these current charges have been reviewed in detail by ARDC; and now, I will take prompt action to settle this account." (Emphasis in original.)

During the hearing before the Hearing Board, respondent testified Fruitts had "a severe alcoholic problem" and would come to his office inebriated. Respondent also testified Fruitts would appear at his office unannounced, fall asleep in his office and become obnoxious. Fruitts and her spouse testified, however, that she rarely drank alcohol and only consumed about four drinks per year. Fruitts also denied she had ever visited respondent without an appointment or fallen asleep in his office.

The Hearing Board found that respondent's March 17, 1982, billing statement "did not reflect true and accurate charges for work itemized and contained charges for work not done and was excessive." The Hearing

Board also stated that "[t]his finding is made on various of the charges *not* including certain charges that Respondent alleges were inadvertently made for certain work he did in preparing to respond to the charge or complaint brought against him before the Disciplinary Commission." (Emphasis in original.) The Hearing Board found further:

"Respondent did not testify truthfully and with candor regarding the Fruitts matter for the following reasons. In attempting to refute Mrs. Fruitts' testimony, the Respondent testified on several occasions that she was an alcoholic, that she was obnoxious, that she had fallen asleep in his office, and such similar testimony as a full or partial explanation of why the fee would appear to be excessive. As rebuttal witnesses the Administrator recalled Mrs. Fruitts and her husband, Mr. Frank Fruitts. They both testified that Mrs. Fruitts was not an alcoholic that she was practically a non-drinker, with both of them estimating that her drinking of alcoholic beverages for the past ten or twelve years had been limited to a drink or two during the holidays. The Panel accepts the testimony of Mr. and Mrs. Fruitts as being the truth and therefore finds that the Respondent lied repeatedly in his testimony regarding the drinking habits of Mrs. Fruitts."

The Hearing Board concluded respondent violated two rules of the Code: "Rule 1—102(a)(iv) as there was misrepresentation in his billing" and "Rule 2—106(a) in that he charged excessive fees." 107 Ill. 2d Rules 1—102(a)(4), 2—106(a).

## Count II

On February 7, 1981, respondent entered into a written agreement with Salle Jo Carbone to represent her in a cause of action against her former husband to obtain past-due child support and increase future child-support payments. The agreement provided that respondent would charge $60 per hour for his services and Carbone

would give respondent a $125 retainer. The agreement also provided that Carbone would pay respondent a percentage of the net recovery he obtained for her.

One clause of the agreement stated as follows:

> *"No Accounting by Attorney.* Client directs that Lawyer shall not be required, at any time whatsoever, to give any account or accounting of time expended, disbursements made, expenses incurred or any money he has received or may receive by reason of any settlement or award or of any money he has or may spend or disburse by reason of the prosecution of this claim." (Emphasis in original.)

Respondent called this "the little old lady clause." He stated, "It is a portion of a contract that's been used year and year and time and time again and is in there for the purpose of allowing the attorney for [*sic*] freedom without the harassment of the typical little old lady that wants to know how her account is going all the time." When asked if he felt the clause was unconscionable, respondent replied:

> "No. I think it absolutely has a purpose, it's absolutely correct. There is no question but what it's utilized every day and I cite for the [Hearing Board], and these fellows have probably used it themselves in personal injury cases, in collection cases, that's exactly the way."

By May 1981, Carbone had remitted the full $125 retainer to respondent. On September 28, 1981, respondent obtained a $5,390 judgment on behalf of Carbone against her former husband for the child-support arrearage. Carbone's former husband was ordered to pay $60 per month until the judgment was paid in full and to send the payments to respondent.

Respondent began receiving the monthly payments from Carbone's former husband in September 1981. According to Carbone, respondent did not inform her he was receiving the payments. Carbone testified she

learned from her former husband that respondent was receiving the payments. Upon obtaining this information from her former husband, Carbone contacted respondent and asked him to remit her part of the payments. Respondent told Carbone his contingent fee, one-third of the total judgment, had to be collected before he would make any payments to her. On April 23, 1983, Carbone filed a complaint against respondent with the ARDC.

As of June 1983, respondent had received $1,320 from Carbone's former husband. Respondent deposited the money in his personal checking account at the Springfield Marine Bank in Illinois. The account was a credit account wherein the bank automatically advanced the customer money to prevent overdrafts. Respondent testified he used this account to pay his personal expenses. When asked why the account was periodically overdrawn, respondent replied that the account was "[a]lways overdrawn. That's the way I operate. That's standard operating procedure."

Respondent testified he also maintained a trust account—a money market fund—with Scudder Cash Investment Trust in Boston, Massachusetts. Respondent's testimony seemed to indicate that after he deposited his clients' funds in the Springfield account, he would then transfer those funds to the Boston account. No evidence was presented as to whether respondent transferred Carbone's funds to the Boston account. Nevertheless, respondent testified he placed his personal funds in the Boston account, and he retained the interest which accrued on the account. Respondent testified he did not know he had to treat his clients' monies separate from his own funds. Respondent asserted that the Inquiry Board of the ARDC first alerted him to this requirement. Respondent testified he thereafter established a proper trust account. On March 5, 1984, respondent re-

mitted to Carbone $880, or two-thirds, of the $1,320 he had collected.

The Hearing Board found that Carbone "made repeated demands upon Respondent for her portion of the settlement funds and no funds were delivered to her and no accounting given." The Hearing Board also stated, "[I]t was Respondent's position that he was entitled to collect his one-third fee in full before distributing or dispersing any settlement proceeds to Carbone." The Hearing Board further found: "Respondent did not maintain a client's trust account and failed to deposit money he received on behalf of Carbone in an identifiable trust account, and any funds he received he commingled with his own funds and converted to his own use."

The Hearing Board concluded respondent violated the following rules of the Code: (1) "Rule 9—102(c)(i) in that he failed to properly notify his client of the receipt of her funds"; (2) "Rule 2—106(c)(iii) and [*sic*] that he failed to prepare any type closing statement setting forth the application of his contingent fee agreement"; (3) "Rule 9—102(c)(iv) in that he failed to properly pay or deliver to his client the funds which she was entitled to receive"; and (4) "Rule 9—102(a) in that he failed to deposit his client's funds in a separate identifiable trust account, and commingled the funds with his own and converted said funds to his own use." 107 Ill. 2d Rules 9—102(c)(1), 2—106(c)(3), 9—102(c)(4), 9—102(a).

## Count XVII

John C. Jacobs testified he entered into an agreement with respondent wherein respondent would represent Jacobs to collect $490 allegedly owed to Jacobs' company, Colonial Fence & Wire, by John W. and Barbara Beecraft. Respondent filed a small claims action on Jacobs' behalf against the Beecrafts on December 29, 1981. That same date, a summons was issued to the Beecrafts in-

structing them to appear at a hearing on January 22, 1982. Respondent failed to appear at the January 22 hearing and the cause was dismissed for want of prosecution upon the Beecrafts' motion.

On February 5, 1982, respondent filed a motion to reinstate Jacobs' cause of action, and on February 18, 1982, the motion was granted. A hearing was held on April 22, 1982, during which a default judgment was entered against the Beecrafts for $490 plus costs. Respondent thereafter obtained two wage-deduction orders, one on March 29, 1983, and another on April 28, 1983, against John Beecraft's employer.

Respondent wrote two letters to John Beecraft's employer, dated March 30, 1983, and April 26, 1983, in which he requested the employer to send checks representing the wages of John Beecraft in the amounts set forth in the wage-deduction orders. In his letters, respondent requested the employer to mail the checks to respondent's law office. On April 13, 1983, and May 11, 1983, the employer sent two warrants, payable to Jacobs and totaling $559.64, to respondent.

Jacobs testified he asked respondent many times for the funds respondent had received from John Beecraft's employer. When Jacobs was asked what respondent had said in response to these inquiries, Jacobs testified:

> "[Respondent] [t]old me a lot of things. One time he told me he lost the check, another time he told me that he would bring the check over and he didn't. He just never gave me the check."

Jacobs and respondent had a meeting concerning their dispute over this and other legal work respondent had allegedly performed for Jacobs. Jacobs testified that, as a result of the meeting, "[respondent] and I agreed that I didn't owe him anything and he didn't owe me anything except the check." Respondent testified he asked Jacobs to sign the warrants over to him as com-

pensation for the additional legal work respondent had allegedly performed for Jacobs. Respondent stated Jacobs refused to endorse the warrants. Respondent testified he thereafter put the warrants in his file and closed the file.

After this meeting, in a letter dated June 21, 1983, respondent advised Jacobs he would send Jacobs a list of the costs, expenses and legal fees he incurred for all of the cases, including the Beecraft collection case, he had undertaken on Jacobs' behalf. Jacobs testified he thereafter received many bills from respondent for these cases. Respondent sent Jacobs one such billing statement, dated August 5, 1983, which included respondent's work on the Beecraft case. The statement listed a charge for attending a hearing on January 27, 1982. No hearing, however, was held regarding the Beecraft case on that date. A hearing was held on January 22, 1982, but respondent was absent from the hearing. The billing statement totaled $870.80 for fees and expenses. This amount included charges for other legal services respondent allegedly performed on the Beecraft case in addition to the collection matter.

In November 1983, the two warrants became void because the warrants had not been presented for payment within six months of the date issued. On September 19, 1984, respondent filed several lawsuits against Jacobs for legal fees Jacobs allegedly owed respondent. Jacobs filed a complaint against respondent with the ARDC on September 21, 1984.

Jacobs hired attorney Michael Atkins to represent him on a variety of matters, including the lawsuits respondent had filed against Jacobs and the Beecraft collection case. In May 1984, Atkins sent letters to John Beecraft's employer requesting the employer to issue replacement warrants for the two void warrants. Respondent thereafter sent John Beecraft's employer a notice of

attorney's lien dated June 5, 1984. The notice indicated respondent was entitled to one-third of the proceeds of the warrants. In July 1984, Jacobs and respondent reached an agreement that Jacobs would receive $373.09, or two-thirds, of the proceeds of the warrants and respondent would receive $186.55, or one-third, of the proceeds of the warrants. The replacement warrants were subsequently issued. Respondent, Jacobs and Atkins each received one-third of the proceeds of the warrants.

The testimony of respondent and Jacobs conflicted regarding their agreement as to how respondent was to be paid for his legal services in the Beecraft collection case. Upon reviewing the August 5, 1983, billing statement respondent had sent to Jacobs, respondent stated he "was to be paid upon time and charges." Respondent denied he was to be paid on a contingent fee basis. Jacobs, however, testified that he and respondent had agreed respondent would be paid on a one-third contingent fee basis. When respondent was asked whether Jacobs was being truthful when Jacobs testified that they had a contingent fee agreement, respondent replied: "I would prefer to say that Mr. Jacobs is a nut and that he is nutty most of the time if not a large part of the time." Respondent also called Jacobs' claim "completely ridiculous." The notice of attorney's lien respondent sent to John Beecraft's employer, however, stated that respondent and Jacobs had entered into a contingent fee agreement. When this was brought to respondent's attention, respondent testified he charged Jacobs on an hourly basis for filing the suit and obtaining the judgment, and he charged Jacobs on a contingent fee basis for collection of the judgment. Although the judgment was obtained on April 22, 1982, the notice of attorney's lien indicated Jacobs and respondent had entered into the contingent fee agreement on November 15, 1981, approximately five

months before the judgment was even entered. Commenting on this fact, respondent testified that it "[s]ounds like a typo to me."

The Hearing Board found that respondent "agreed to represent Jacobs on a one-third contingency fee for a certain collection against the Beecraft[]s." The Hearing Board also found that after the default judgment and wage-deduction orders were entered, John Beecraft's employer issued two warrants and respondent "failed to take any action to distribute the warrants to his client and failed to deposit the warrants in a client trust account." The Hearing Board further found:

"4. Following repeated demands on the Respondent to distribute the proceeds, the Respondent refused to act and the warrants became void.

5. The Respondent subsequently sent Jacobs a statement for services allegedly performed on Jacobs' behalf for the litigation stated above.

\* \* \*

8. \*\*\* Respondent had entered into a contingent fee arrangement with Jacobs but subsequently billed Jacobs on an hourly rate and \*\*\* said billing for work done on an hourly rate was inappropriate.

9. The Respondent failed to distribute funds to his client.

10. The statement incorporating the hourly rate billing was an inappropriate and false type billing."

The Hearing Board then concluded respondent violated the following rules of the Code: (1) "Rule 2—106(c)(ii) and [*sic*] that he failed to secure a written contingency agreement"; (2) "Rule 1—102(a)(iv) in that his conduct involved dishonesty, deceit and misrepresentation"; (3) "Rule 9—102(c)(iv) in that he failed to properly pay funds due to a client upon demand"; and (4) "Rule 7—101(a)(iii) in that he intentionally damaged or prejudiced his client during the course of the professional re-

lationship." 107 Ill. 2d Rules 2—106(c)(2), 1—102(a)(4), 9—102(c)(4), 7—101(a)(3).

## Count XXI

On November 8, 1986, Felicia Harris met with respondent concerning respondent's possible representation of her in a personal bankruptcy proceeding. Respondent advised Harris his total fee would be $350, excluding a $90 filing fee. Respondent informed Harris he could not begin work on her case until she paid him the full $90 filing fee. Respondent and Harris met again on November 14, 1986. Harris paid respondent the total $90 filing fee in a check dated November 17, 1986. Harris testified she and respondent agreed she would pay the $350 in two installments, one at the end of November and one on or about December 15. Harris, however, signed a promissory note dated November 7, 1986, in which she promised to pay the full $350 by December 5, 1986.

On November 14, 1986, respondent filed a bankruptcy petition on Harris' behalf in the United States Bankruptcy Court for the Central District of Illinois. Respondent, on that same date, also filed a "Disclosure of Fees Under Rule 219(b)" (Disclosure), which stated he had been paid $60 by Harris for legal fees and was to be paid a total of $350 for his legal services. Respondent also filed, on November 14, an "Application to Pay Filing Fees in Installments" (Application), which stated as follows:

"2. [Harris] is unable to pay the filing fees except in installments.

3. [Harris] proposes to pay such fees to the clerk of the Bankruptcy Court upon the following terms:

Payment of Ten ($10.00) Dollars upon filing of Chapter 7 Petition on November 14, 1986.

and a

Payment of Ten ($10.00) Dollars on Friday, November 28, 1986; and a

Payment of Ten ($10.00) Dol[la]rs on F[ri]day every two weeks thereafter until $90.00 fee is paid.

4. [Harris] has paid no money and transferred no property to h[er] attorney for services in connection with this case or any pending case under Title 11, United States Code, and [s]he will make no payment or transfer to h[er] attorney for such services until the filing fees are paid in full.''

Respondent testified he spent $10, of the $90 Harris gave him, to file the bankruptcy petition, and he kept the remaining $80. Respondent testified that the remaining $80 was not to be used for legal fees; the entire $90 was paid for filing fees. Harris testified she was not aware respondent had filed the Disclosure or the Application, she had not paid respondent $60 on November 14 for legal fees, and she had not proposed to respondent she pay her filing fees in installments.

In explaining why he filed the Application, respondent testified:

"In the process of dealing with many bankrupts, I have—I have developed a sense and that my senses told me that she was trying to beat me out of my legal fee. She was trying to avoid paying money. She wanted to get the results, but she was going to try to beat me out of my fee.

When I went to the Clerk's Office, I asked for and received a copy of an application for the time payment of the application fee.

MR. HELLER [Respondent's Attorney]: What was the purpose of that?

A. [Respondent]: One of the, in quotes, tricks of the trade, one of those things that one gets the experience in dealing with more and more bankruptcy cases, was a procedure when you suspect someone is going to try to beat you out of a fee, your procedure is to file an application

for payment of the fee on time. That's what I did. And I said—

Q. How does that protect the lawyer?

A. Well, it means that you will be given time to pay that fee, and in other words, you are giving the court the opportunity to discharge or get rid of that bankruptcy petition.

Q. What's the normal cost to file this petition?

A. Ten Dollars ($10). So, what you do, you're only out then, if you're going to take this person's word that they're going to pay you even though I had this sense that she wasn't, I found I would go ahead and do it and then I would have my time involved in it and I would have $10, and in the meantime, if she was going to be straightforward and truthful, then she would come up with the funds and then it would be paid and it's all over with."

Thus, according to respondent, if Harris did not pay respondent's legal fees, then respondent would not make the subsequent installment payments for the filing fee, and the bankruptcy petition would be dismissed.

On November 18, 1986, the bankruptcy court entered an order granting respondent's request to have Harris pay the filing fee in installments. The order indicated the balance owed for the fee, $80, was to be paid on or before November 24, 1986. The clerk of the bankruptcy court also sent a letter to respondent dated November 18, 1986, which stated: "It appears from the disclosure statement which you filed that you were paid $60.00. According to Bankruptcy Rule 1006b(3) the case filing fee must be paid in full before the debtor may pay an attorney for services in connection with the case." Harris was sent a copy of the order and the letter. Harris testified she attempted to contact respondent to discover why the entire fee was never paid, but respondent was not in town at the time.

Respondent testified he never made any subsequent payments on the balance of the filing fee owed. Respondent stated he did not do so because Harris failed to pay him the first of two installments toward the $350 legal fees she owed him. On December 3, 1986, the bankruptcy court dismissed Harris' case for failure to pay the filing fee. Respondent has not returned the $80 to Harris.

The Hearing Board made the following findings of fact:

"2. Respondent advised Harris that $90 would be needed for filing fees and he received $90 from her for filing fees.

3. Respondent filed a *Voluntary Petition under Chapter 7*, an *Application to Pay Filing Fees in Installments*, and a *Certificate of Disclosure of Fees Under Rule 219(b)* in the Harris matter, and at the same time Respondent paid $10 to the Clerk of the Court as partial payment of the filing fee.
* * *

5. *** [T]he statements contained in the Application made and signed by the Respondent were false, as the $90 received from Harris was to be used for filing fees.

6. The *** Disclosure stated that he had been paid $60 from Harris for services rendered and that statement was false.

7. That $10 of the $90 was used for costs and the remaining $80 was retained by Respondent for his own use.

8. Subsequently, an Order was entered directing Harris to pay the balance of the $80 in filing fees.

9. The Respondent failed to remit the $80 to the Clerk of the Court.

10. Subsequently an Order was entered in the Harris case dismissing the case for non-payment of filing fees and a copy of that Order was served on the Respondent.

11. The Respondent took no further action on the Harris case and failed to make restitution of the $80."

The Hearing Board concluded respondent "filed documents with the Bankruptcy Court that contained knowingly false statements, he neglected the Harris case in that he failed to pay the costs permitting it to be dismissed and he converted and commingled $80 of his client's funds." The Hearing Board also concluded respondent "committed illegal conduct involving moral turpitude in violation of Rule 1—102(a)(iii)" of the Code (107 Ill. 2d R. 1—102(a)(3)). The Hearing Board determined respondent's conduct involved "dishonesty, fraud, deceit and misrepresentation in violation of Rule 1—102(a)(iv)" of the Code, and was "prejudicial to the administration of justice in violation of Rule 1—102(a)(v)" of the Code (107 Ill. 2d Rules 1—102(a)(4), 1—102(a)(5)). The Hearing Board concluded respondent "neglected a legal matter entrusted to him in violation of Rule 6—102(a)(iii)" of the Code. (The Hearing Board mistakenly cited this violation of Rule 6—101(a)(3) as a violation of Rule 6—102(a)(3).) Finally, the Hearing Board determined respondent "failed to keep [the] client's funds in an attorney/client trust account in violation of Rule 9—102(a)" of the Code (107 Ill. 2d R. 9—102(a)).

## Count XXIII

On October 3, 1985, Arthur L. Smith filed a small claims complaint against Odom Sausage Company, Tennessee Pride Company and Gary Ferguson in the amount of $1,016.52 plus costs for alleged damage to a concrete driveway on property owned by Smith. Smith testified the cost to repair the damage to the driveway was approximately $1,400. The defendants in the case retained an attorney. Smith subsequently decided to hire respondent to represent him in the matter. On November 8, 1985, Smith met with respondent in respondent's office to discuss the case. Respondent advised Smith at

this meeting that his total fee for handling the case would be $750. Smith paid respondent $400 towards this fee. On November 12, 1985, respondent entered his appearance in the case on behalf of Smith.

On December 19, 1985, respondent filed an amended complaint in the case claiming Smith's total damages were in excess of $14,000. The amended complaint alleged defendants owed Smith over $14,000 in additional rent for the commercial use of the property. The amended complaint also sought recovery for the damaged driveway in the amount of $1,325, attorney fees, and costs. Smith admitted he signed the verification on the amended complaint, but said he did so because:

"I had confidence in [respondent] to recover my loss, and I thought this, when he said, he said we got to sue for more money, frankly, the figures was astounding and, again, I had confidence in him to get the job done, not expecting to recover this kind of money, no. In fact, I never—I went to Small Claims first to try to get the cost of the driveway. That didn't work, and I got a bad deal over there, their attorneys, of course, had me in over my head before I got started. So, when I went to [respondent], I'm putting my confidence in a professional person expecting him to see it through. And when he drafted these papers, this complaint or whatever, I'm putting my confidence in him that this is the way you fight a lawsuit. I never fought one before. Frankly, we got a big laugh out of it. But again, thinking that this is the way, if you got to do business this way, this is the way you got to do it. That's my understanding."

Respondent thereafter entered into settlement negotiations with defendants' attorneys.

During these negotiations, Smith authorized respondent to settle the case for $1,800. On September 23, 1986, respondent notified Smith he had received an $1,800 check from the defendants. On or about the same date, Smith received a bill from respondent in the amount of

$1,318.96. The bill credited Smith for the $400 Smith had previously paid respondent. Thus, the balance of the bill was $918.96. Smith testified that respondent told him he would get the settlement check when he paid the bill.

Smith thereafter filed a complaint against respondent with the ARDC. Smith was subsequently informed that as a result of his complaint, formal charges would be filed against respondent on March 16, 1987. On July 6, 1987, Smith and respondent signed a document in which they agreed respondent would receive $918.96 from the $1,800 check and Smith would receive $881.04, or the balance of the proceeds from the check. Smith signed the settlement check and respondent kept the check. Respondent then executed a personal check in the amount of $881.04 payable to Smith.

The document Smith and respondent signed also contained the following:

"*Release*
The undersigned contract to release all claims, demands, complaints, and to forever discharge Sangamon County Case No. 85 SC—5887 and Attorney Registration And Disciplinary Commission Case No. 86 SI—5814. This release is entered in good faith to dismiss all claims whatsoever, and payment is *not* to be construed as an admission of liability by either party." (Emphasis in original.)

This clause purported to release Smith's ARDC action against respondent as well as Smith's case against the defendants. On July 7, 1987, the ARDC received from respondent a copy of the document and a letter which stated: "Please take the necessary procedural steps to dismiss these ARDC proceedings."

The Hearing Board made the following findings of fact:

"3. *** Respondent suggested to, and convinced Smith that an Amended Complaint should be filed against

the defendants setting forth several other claims for payment, including one claim of $14,000 for a theory based on a charge of back rent for the usage of certain space by a commercial vehicle. Smith agreed that he originally leased the apartment and had no intention of charging for any type rent for the parking of the vehicle.

\* \* \*

12. On or before July 6th, 1987, Respondent entered into negotiations with Smith seeking a dismissal of the Administrator's investigation and Respondent advised Smith he would endorse the settlement draft and pay Smith if Smith would agree to dismiss the investigation before the Disciplinary Commission.

\* \* \*

16. The [Hearing Board] finds that while the original agreed upon amount was probably $750, it notes that additional work was probably done by the Respondent in attempting to prove the additional claim in the Amended Complaint, and that while that Verified Amended Complaint was based on a frivolous and non-existent claim, that apparently Smith went along with it believing that this would be the best way to get some action on his $1,400 claim.

17. The [Hearing Board] finds that the conduct of the Respondent in pursuing a frivolous claim and in attempting to use alleged criminal violations to press for a civil recovery, and further to have his client sign a verification to a Complaint knowing that it was false would involve a high degree of unethical conduct but notes that there are no charges or allegations in this Count to that effect.

18. The [Hearing Board] finds that the conduct of the Respondent in attempting to have disciplinary charges against him dismissed through the coercion of paying funds does amount to unethical conduct."

The Hearing Board concluded respondent's "conduct in securing Smith's agreement to dismiss disciplinary proceedings against the Respondent in return for a payment of settlement funds" violated the following rules of

the Code: (1) "Rule 1—102(a)(iii) in that it was conduct involving moral turpitude"; (2) "Rule 1—102(a)(iv) in that it was conduct involving dishonesty, deceit, and misrepresentation"; and (3) "Rule 1—102(a)(v) in that said conduct was prejudicial to the administration of justice." (107 Ill. 2d Rules 1—102(a)(3), 1—102(a)(4), 1—102(a)(5).) The Hearing Board also noted that if the Administrator amended the complaint against respondent to include allegations that respondent knowingly advanced an unwarranted claim in violation of Canon 7, Rule 7—102(a)(ii), of the Code (107 Ill. 2d R. 7—102(a)(2)), the Board would find respondent in violation of said rule.

### Analysis of Issues

Respondent, in his brief, disputes many of the facts set forth in the Administrator's brief, as well as many of the findings of fact of the Hearing Board. For example, Fruitts testified respondent advised her the $500 retainer she paid would cover his entire fee for the case. Respondent contends, however, that he required the $500 retainer fee from Fruitts with the understanding he would bill her $60 per hour plus expenses. Respondent makes a similar argument with respect to the $750 retainer fee Smith was required to pay. Respondent also argues that his bill for legal services in the Fruitts case was justified. In the Harris case, respondent asserts he made no false statement. Moreover, respondent maintains the amended complaint filed in the Smith case had a reasonable basis in Federal and Illinois law.

We have reviewed these as well as the other factual discrepancies respondent raises in his brief. We note that because the Hearing Board hears the testimony and observes the demeanor of the witnesses, it is in the best position to weigh conflicting testimony and determine the credibility of the witnesses. (*In re Teichner* (1984), 104 Ill. 2d 150, 157.) Therefore, factual determinations

of the Hearing Board "are to be given substantially the same weight as those of other fact-finding bodies." (*Teichner*, 104 Ill. 2d at 157; *In re Harris* (1982), 93 Ill. 2d 285, 292.) We conclude that sufficient evidence exists in the record to support the findings and conclusions of the Hearing Board. Consequently, we reject respondent's contentions.

The next issue concerns the appropriate sanction for respondent's misconduct. The purpose of the attorney disciplinary process is to "safeguard the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach." (*Teichner*, 104 Ill. 2d at 160.) This court "has the ultimate responsibility for determining and imposing the appropriate sanction, and to this end the recommendations of the hearing panel and Review Board are advisory only." (*Teichner*, 104 Ill. 2d at 166; *Harris*, 93 Ill. 2d at 292.) "With respect to the discipline to be imposed, each case must be judged individually based on the specific circumstances and conduct involved; however, this court is keenly aware of the necessity for consistency in the imposition of discipline in similar cases." *Harris*, 93 Ill. 2d at 296.

Respondent's egregious conduct leaves this court with no doubt that respondent must be disbarred from the practice of law. The Hearing and Review Boards found that respondent committed at least 18 acts of misconduct in violation of at least 11 disciplinary rules. In summary, the Boards found respondent committed the following violations of the Code:

(1) Two acts of illegal conduct involving moral turpitude in violation of Canon 1, Rule 1—102(a)(3).

(2) Four acts of conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Canon 1, Rule 1—102(a)(4).

(3) Two acts of conduct prejudicial to the administration of justice in violation of Canon 1, Rule 1—102(a)(5).

(4) One act of charging an excessive fee in violation of Canon 2, Rule 2—106(a).

(5) One act of failing to put a contingent fee agreement in writing in violation of Canon 2, Rule 2—106(c)(2).

(6) One act of failing to prepare a closing statement setting forth the application of a contingent fee agreement in violation of Canon 2, Rule 2—106(c)(3).

(7) One act of neglecting a legal matter in violation of Canon 6, Rule 6—101(a)(3). (The Hearing Board mistakenly cited this as a violation of Rule 6—102(a)(3).)

(8) One act of intentionally prejudicing or damaging a client during the course of the professional relationship in violation of Canon 7, Rule 7—101(a)(3).

(9) Two acts of failing to deposit funds of clients in a separate identifiable trust account in violation of Canon 9, Rule 9—102(a).

(10) One act of failing to promptly notify a client of the receipt of funds in violation of Canon 9, Rule 9—102(c)(1).

(11) Two acts of failing to promptly pay to the client, as requested by the client, the funds in respondent's possession to which the client is entitled in violation of Canon 9, Rule 9—102(c)(4).

The Hearing Board also noted that if the Administrator amended the complaint against respondent to include allegations that respondent committed one act of knowingly advancing an unwarranted claim in violation of Canon 7, Rule 7—102(a)(2), the Board would find respondent in violation of said rule.

We particularly note that most of these acts constitute serious violations of the Code. Respondent was found guilty of commingling and conversion of client funds. The Hearing Board found that he committed no less than four acts of dishonesty, fraud, deceit or misrepresentation. He was also found guilty of neglecting a legal matter, intentionally damaging a client, and charging excessive fees. In addition, the Hearing Board found that respondent lied during his testimony.

The findings of the Hearing Board encompassed respondent's actions against five different clients over a seven-year period. In Fruitts' case, respondent advised her his fee would be $500. After she filed a complaint against him with the ARDC, he sent her a bill for over $2,100. The bill included charges for over five hours respondent spent reviewing and answering Fruitts' ARDC complaint against him. The bill also included excessive and inaccurate charges, as well as charges for meetings and calls which did not take place. Respondent initially did not credit Fruitts for the $500 she had previously paid him. In subsequent billing statements—sent after respondent discovered the Inquiry Board had voted a complaint against him—respondent charged Fruitts $2,350. These statements included a note which falsely implied the ARDC had approved the statements. In order to discredit Fruitts' testimony, respondent testified before the Hearing Board that Fruitts was an alcoholic. Fruitts and her spouse denied the allegation and the Hearing Board accepted their testimony. The Hearing Board specifically found that respondent "lied repeatedly in his testimony regarding the drinking habits of Mrs. Fruitts."

Respondent's written agreement with Carbone indicated he not only would charge her $60 per hour, but also would receive a percentage of her net recovery from the suit. Moreover, the agreement contained what re-

spondent called a "little old lady clause" which stated he would not be required to give any accounting to Carbone whatsoever for time he expended, disbursements he made, expenses he incurred, or money he received in a settlement or judgment on her case. Respondent had no misgivings about this clause. He testified that its purpose was to give him freedom from harassment by the "typical little old lady that wants to know how her account is going all the time." Respondent also testified he did not consider the clause unconscionable. He attempted to justify the clause by alleging that it was used every day by other attorneys.

Respondent did obtain a judgment in the amount of $5,390 for Carbone. When respondent began receiving the payments for the judgment, however, he did not inform Carbone that he had received the payments, and he refused to remit any part of the payments to her. Respondent instead contended that he had to collect one-third of the entire judgment for his fee before he would give her any portion of the payments.

Respondent deposited the funds he received from Carbone's former spouse into his own personal bank account, a bank account which was often overdrawn. Respondent testified he did not know he had to keep his clients' funds separate from his own; he first learned of this from the Inquiry Board. Respondent has since established a client trust account, but only after initiation of the ARDC action against him. In addition, respondent remitted to Carbone one-third of the funds he received towards payment of the judgment, but again only after the ARDC action was instituted against him.

In his representation of Jacobs, respondent obtained a $490 judgment against the Beecrafts, two wage-deduction orders, and two warrants in satisfaction of the judgment and wage-deduction orders. Once again, however, respondent refused to give his client the money he had

received. Respondent alleged Jacobs owed him money for additional legal work and therefore wanted Jacobs to sign the warrants over to him. Jacobs refused to sign the warrants over to respondent, so respondent just put the warrants in a file. Respondent subsequently sent Jacobs a bill for over $870. The bill was based on an hourly rate. Because the warrants were not presented for payment within six months of the date of issue, they became void. Jacobs had to hire another attorney to obtain replacement warrants and to represent him in several lawsuits respondent filed against him for legal fees he allegedly owed respondent.

Jacobs testified he had an agreement with respondent that respondent would be paid on a one-third contingent fee basis. Respondent testified that Jacobs was a "nut" and that they had agreed respondent would be paid on an hourly basis. Respondent subsequently changed his testimony and stated that he and Jacobs had agreed he would be paid on an hourly basis for obtaining the judgment and on a contingent fee basis for collection of the judgment. Respondent's notice of attorney's lien, however, indicated he and Jacobs entered into a contingent fee agreement months before the judgment against the Beecrafts was even entered. Believing Jacobs' testimony and evidence, the Hearing Board found that respondent agreed to represent Jacobs on a contingent fee basis, and the billing statement based on an hourly rate respondent sent to Jacobs "was an inappropriate and false type billing."

In the Harris bankruptcy case, Harris paid respondent $90 for the filing fee and agreed to pay him $350 in the future for legal fees. In filing Harris' case, respondent filed two false documents with the bankruptcy court. He filed the Application, which stated Harris was only able to pay her filing fee in installments. He paid the court $10 towards the filing fee and kept the remaining

$80 Harris had paid him. Respondent admitted he knew the entire $90 was to be used for the filing fee, not for his legal fees. The Application also stated Harris would not pay respondent for legal fees until the filing fee had been paid in full. Harris, however, had already agreed to pay the legal fees in full by mid-December, and the Application indicated Harris agreed to pay $10 towards the $80 balance of the filing fee every two weeks beginning November 28, 1986. Thus, contrary to the Application, Harris would have paid her legal fees in full prior to the time the filing fee would be paid in full.

The second document respondent filed, the Disclosure, falsely stated Harris had already paid respondent $60 for legal services. The Disclosure also contradicted the Application wherein respondent stated Harris had not yet paid him any money for legal services. Harris had no knowledge respondent filed either the Application or the Disclosure, and she did not make an agreement with respondent to pay her filing fee in installments.

Respondent testified that in bankruptcy cases he learned to file applications in order to ensure the client pays the legal fees. If the client fails to pay the legal fees, respondent stops making the installment payments on the filing fee and the bankruptcy petition is dismissed; this is what happened to Harris. Thus, respondent filed the Application not because his client was unable to pay the filing fee, but because he wished to use the installment plan as leverage to obtain his legal fee from the client. In doing so, respondent lied not only to his client—by telling her she had to pay the filing fee in full in advance—but also to the bankruptcy court. Moreover, respondent failed to return Harris' $80 to her.

In the Smith case, respondent agreed to represent Smith for a total of $750 in a $1,400 small claims action Smith had already filed. Respondent thereafter amended the complaint to allege damages totaling over $14,000.

The case was settled for $1,800 and a check in that amount was sent to respondent. At about the same time, Smith received a bill from respondent for over $1,300. Respondent agreed to represent Smith for a certain fee but turned around later, after obtaining a judgment on behalf of Smith, and billed Smith for much more. Respondent treated Fruitts and Jacobs in much the same way. Respondent also would not give the settlement check to Smith until Smith paid the bill. This is the same strong-arm tactic respondent used in the Jacobs case and, to some extent, the Carbone case. Unless his clients agreed to pay his fee, they would not get *any* part of the judgment or settlement he obtained on their behalf.

The Hearing Board found that although Smith and respondent originally agreed the fee would be $750, "additional work was probably done by the Respondent in attempting to prove the additional claim in the Amended Complaint." The Board, however, went on to find that the amended complaint was "based on a frivolous and non-existent claim." The Board further found that "the conduct of the Respondent in pursuing a frivolous claim and in attempting to use alleged criminal violations to press for a civil recovery, and further to have his client sign a verification to a Complaint knowing that it was false would involve a high degree of unethical conduct."

After the ARDC filed formal charges against respondent as a result of Smith's complaint, Smith and respondent reached an agreement to distribute one-third of the settlement to respondent and two-thirds to Smith. The agreement, however, contained a release clause which stated that Smith and respondent agreed to dismiss the ARDC case against respondent. Respondent then forwarded a copy of the agreement with the release to the ARDC. The Hearing Board found that respondent's action "in attempting to have disciplinary charges against him dismissed through the *coercion* of paying

funds does amount to unethical conduct." (Emphasis added.) Thus, respondent forced Smith to agree to a purported release of the ARDC action before respondent would give Smith the money to which Smith was rightfully entitled.

Respondent's conduct did not involve an isolated incident. He has exhibited a pattern of gross misconduct. He repeatedly lied. He lied to clients about the fee he would charge them for his services. He lied before the Hearing Board that one client was an alcoholic. This court has previously held: "[A]lthough an attorney can be tried only for the conduct charged against him, the failure to be candid and the giving of false testimony further demonstrates his unfitness to pursue the practice of law." *Harris*, 93 Ill. 2d at 296.

Respondent repeatedly executed fraudulent documents. He sent a client a billing statement which included charges for work not done and meetings not attended. Respondent entered into a contingent fee agreement with a client, but then sent the client a bill based on an hourly rate. He filed documents with the bankruptcy court which contained false statements. He filed an amended complaint with the court which was based on a frivolous and nonexistent claim.

Respondent commingled and converted clients' funds. He failed to set up a separate client trust account. He failed to account to his clients for their money. In one case, he had a "no accounting," or "little old lady," clause in his contract with his client which provided that he did not have to account for any money he spent or received on the client's behalf. Respondent charged an excessive fee and refused to remit to his clients their money when they demanded it.

Respondent forced his clients to pay all of his fees before they could obtain *any* of the proceeds of their judgment or settlement. Respondent charged a client an ex-

cessive fee after she filed a complaint against him with the ARDC. Respondent coerced a client into signing a release of the ARDC action the client had filed against respondent by conditioning the client's receipt of settlement proceeds on the release. Respondent allowed a bankruptcy case to be dismissed for failure to pay the filing fee—even though the client had paid the filing fee in full—because the client had not paid respondent's legal fees.

Disbarment is "particularly warranted" where the "conversion and fraud involved were intentional and consisted of a series of improper acts over an extended period of time," and where "respondent has manifested a pattern of behavior which clearly tends to bring the legal profession into disrepute." (*In re Feldman* (1982), 89 Ill. 2d 7, 13.) Moreover, we note that this court has repeatedly condemned the practice of commingling and conversion of clients' funds. *In re McLennon* (1982), 93 Ill. 2d 215, 220-21; *In re Clayter* (1980), 78 Ill. 2d 276; *Feldman*, 89 Ill. 2d 7; see *Teichner*, 104 Ill. 2d 150.

In order to determine the appropriate sanction to be imposed, however, mitigating factors must be taken into account; such factors include "the length of time in practice, previous misconduct, whether and when restitution is made if it is owing, community service, *pro bono* legal work, and the testimony of character witnesses and professional colleagues." (*In re Lenz* (1985), 108 Ill. 2d 445, 453-54.) Another factor to consider in mitigation is whether the conduct resulted from dishonest motives. See *Clayter*, 78 Ill. 2d at 283.

Respondent has been a licensed attorney for 26 years. He is licensed in Kansas, Arkansas, Oklahoma, Wisconsin and Illinois. He was admitted to the Illinois bar in 1976. Respondent has not been previously disciplined. Respondent has worked as a staff attorney for the Urban Renewal Agency in Kansas City, Kansas; as a mem-

ber of the Kellett Reorganization Commission, which reorganized Wisconsin State government; as general counsel for the Wisconsin Department of Transportation; as a hearing officer for the Illinois Commerce Commission; and as general counsel for the Department of Drivers Services of the Illinois Secretary of State. Respondent has been active in the State bar associations of both Oklahoma and Wisconsin. He also was an Assembly Delegate from the Seventh Judicial Circuit with the Illinois State Bar Association. Respondent argues his activities in the State bar associations reveal his concern with his profession. We also note, however, that respondent did not present any evidence of community service or *pro bono* legal work he has done. Moreover, the record does not contain the testimony of any character witnesses or professional colleagues on respondent's behalf.

Respondent alleges his actions were not based on any dishonest motives. Respondent points out that although he has been an attorney for over 25 years, he did not work in a private law practice until 1978, only two years before the alleged misconduct began. Respondent contends his relative inexperience in the private practice of law should be considered in mitigation by this court. Respondent argues his failure to set up a trust account for his clients' funds was based on ignorance and inexperience in the private practice of law. Respondent asserts he remedied this error when it was brought to his attention by the Inquiry Board.

Respondent argues that his mistakes did not include taking a client's money or property. Respondent asserts in his brief that no restitution is necessary because "[h]e has handled his Client[s'] funds faithfully without a loss of a penny to the Clients." The Administrator, on the other hand, contends respondent converted the remaining $80 Harris paid him for the bankruptcy filing fee, and respondent has not made restitution of this amount.

Respondent points out Harris never paid him for his legal services and therefore implies that he is entitled to the $80 as partial payment for those legal services.

Respondent states he made a mistake in the procedures he used in bankruptcy court, but he claims those mistakes were the result of erroneously following procedures used by other attorneys in bankruptcy court. Respondent states in his brief that the practices he used were "not the result of a malignant heart or a desire to mislead the Court, or to injure the Client."

As to the settlement and release of the ARDC matter in the Smith case, respondent testified that, at the time, he thought this was proper. Respondent further testified that he sent the ARDC a copy of the release in order to make a full disclosure to the ARDC. Respondent contends in his brief that he undertook the settlement and release at the urging of Smith.

The Administrator points to *In re Jerome* (1964), 31 Ill. 2d 284, in which this court held that conditioning the settlement of a civil suit on the dismissal of a disciplinary action was grounds for sanctions. This court in *Jerome* stated that the "conditioning of the agreement was *** inherently bad, and tended to defeat the administration of justice and to bring the legal profession into disrepute." (*Jerome*, 31 Ill. 2d at 286.) This court also held: "[T]he condition imposed by respondent tended to obstruct an orderly conduct of the disciplinary proceeding, even though the respondent made no effort to conceal the imposition of the condition and the complaining witness did reluctantly appear and testify." (*Jerome*, 31 Ill. 2d at 286.) Respondent in the case at bar notes that the respondent in *Jerome* was only censured, and argues that he, likewise, deserves only censure.

We acknowledge that respondent has not been previously disciplined and has performed some service to the profession through his work in the State bar associa-

tions. Nevertheless, these mitigating factors certainly do not outweigh the extent and severity of respondent's misconduct. We also do not find merit in the other mitigating factors respondent sets before this court. While we are willing to acknowledge respondent's relative inexperience in the private practice of law, we do not conclude that respondent's plethora of misconduct entirely stemmed from inexperience or ignorance. (See *In re Rotman* (1990), 136 Ill. 2d 401, 419-21.) Respondent attempts to blame his commingling and conversion of client funds, his bankruptcy procedures and his settlement of an ARDC action with a client on his inexperience, on other attorneys, and even on his clients. Just as an accused cannot use ignorance of the law as a defense, so too an attorney cannot rely on ignorance of the rules of professional conduct as an excuse. Even assuming other attorneys engaged in some of the same practices as respondent, this fact cannot serve to insulate respondent from responsibility for his own acts. Respondent is not an unthinking robot. He is presumably capable of making his own independent choices in life. Respondent is accountable for and must suffer the consequences of those choices and acts.

We also conclude respondent's actions did stem from dishonest motives. The Hearing Board found respondent engaged in no less than four acts of conduct involving dishonesty, deceit, misrepresentation or fraud. Although respondent states he remedied some of his errors, he only did so when the ARDC intervened.

We further reject respondent's contention that he did not take his clients' money. The Hearing Board specifically found that respondent committed two acts of commingling and converting his clients' funds. Respondent finally gave several of his clients the money to which they were entitled, but only after the ARDC became involved in the cases. Moreover, it is our conclusion that

respondent still owes Harris $80. Respondent contends Harris owes *him* for legal fees. Respondent, however, did nothing for Harris. He did prepare and file her bankruptcy documents, but those documents contained false statements. Although Harris paid respondent the entire filing fee, it was respondent's action in not paying the filing fee in full which resulted in the dismissal of Harris' bankruptcy petition. The Hearing Board specifically found that respondent neglected Harris' legal matter. Consequently, we conclude that Harris is at least entitled to the $80.

As to the Smith matter, we have difficulty believing respondent's conditioning of the settlement upon a release of the ARDC case against him was based on inexperience. Respondent certainly wanted the ARDC matter dismissed. It is our conclusion that respondent did not send the release to the ARDC merely for disclosure purposes. It is clear from the letter respondent sent to the ARDC respondent wanted the ARDC to drop its action against him.

Of particular concern to this court is respondent's complete inability to recognize the wrongfulness of his acts. Respondent testified he saw nothing wrong with his so-called "little old lady clause." The insulting name respondent gave to the clause in and of itself reveals not only respondent's lack of respect for women and the elderly in general, but also his total lack of any sense of obligation toward his clients. The substance of the clause and respondent's explanation of the clause simply confirm this ghastly revelation. Respondent also testified he saw nothing wrong in filing false documents with the bankruptcy court. In order to defend himself and discredit his clients' testimony before the Hearing Board, respondent resorted to calling one client an alcoholic and another a nut. In defending himself against the commingling and conversion charges, as well as several

other charges, respondent claimed ignorance of the proper course of conduct and blamed others for his own actions. The record discloses respondent has shown absolutely no remorse for his repugnant conduct.

Respondent contends *Jerome*, 31 Ill. 2d 284, *McLennon*, 93 Ill. 2d 215, and *Clayter*, 78 Ill. 2d 276, support his argument that he should be censured for his misconduct. In those cases, however, the respondents only engaged in isolated, although serious, instances of misconduct, and, in the latter two cases, they presented extensive evidence in mitigation. Such is not true in the case at bar.

Because of the overwhelming amount of serious misconduct on the part of respondent, the lack of sufficient mitigating factors, and respondent's failure to comprehend the wrongfulness of his actions, we have determined that disbarment is not only appropriate, but essential. Respondent went so far as to lie to the bankruptcy court to defraud a destitute client of $80. We are aware the Hearing Board did not actually find respondent in violation of Rule 7—102(a)(3) of the Code. Although we have mentioned respondent's conduct in that regard, we wish to note that our decision to disbar respondent would not have changed had we ignored that issue altogether. Because we find sufficient evidence in these five counts to disbar respondent, we need not consider the Administrator's contention that the Hearing and Review Boards improperly dismissed count XXII.

For the foregoing reasons, we conclude that respondent should be disbarred from the practice of law. We agree with the Administrator that "[d]isbarment is necessary to protect the little-old ladies in this state, as well as all other members of the public from Respondent."

*Respondent disbarred.*