(No. 76145.—

*In re* MICHELE CHANDLER, Attorney, Respondent.

*Opinion filed August 4, 1994.—Rehearing denied October 3, 1994.*

McMORROW, J., joined by FREEMAN, J., dissenting.

Robert J. Verrando, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Theresa M. Gronkiewicz and George B. Collins, of Collins & Bargione, of Chicago, for respondent.

JUSTICE MILLER delivered the opinion of the court:

The respondent, Michele Elaine Chandler, was admitted to the Illinois bar on April 26, 1988. On March 8, 1991, the Administrator of the Attorney Registration and Disciplinary Commission filed a five-count complaint against respondent. Counts I through IV of the complaint charged respondent with falsifying information regarding her income, employment history, and social security number on a residential loan application, and with preparing and submitting false documents in connection with the loan application, in violation of Rule 1—102(a)(4) of the Illinois Code of Professional Responsibility (Code) (107 Ill. 2d R. 1—102(a)(4)) and of Supreme Court Rule 771 (107 Ill. 2d R. 771). Count V charged respondent with providing false information concerning her social security number and name at birth on her application for admission to the bar of this State, in violation of Rules 1—101 and 1—102(a)(4) of the Code (107 Ill. 2d Rules 1—101, 1—102(a)(4)) and of Supreme Court Rule 771 (107 Ill. 2d R. 771). Both the Hearing Board and the Review Board found that respondent had committed substantially all the misconduct alleged by the Administrator, and both Boards recommended that respondent be suspended from the practice of law for a six-month period. The Administrator has filed exceptions with this court pursuant to Supreme Court Rule 753(e) (134 Ill. 2d R. 753(e)), seeking imposition of a more severe sanction.

In her answer to the complaint, respondent admitted essentially all of the Administrator's allegations, and the facts in this case are not in dispute. The parties presented testimony and documentary exhibits before the Hearing Board on November 5, 1991. Respondent did

not testify on that occasion, but a sworn statement she had previously made and her testimony before the Inquiry Board were both introduced into evidence at that time. In addition, the parties stipulated to certain other evidence.

The evidence in this case shows that in August 1987, respondent submitted a mortgage loan application to Mid-America Mortgage Company for the purchase of a house in Chicago. Respondent was seeking a loan of $84,550 and was prepared to make a down payment of $5,000. On the application, respondent stated that her gross monthly income was $4,000 and that she had been employed as an attorney by another lawyer, Nathaniel Howse, for more than five years. Sometime between August and October 1987, respondent prepared and submitted to Mid-America W-2 withholding statements and Federal and State income tax returns representing that she had earned $42,000 in 1985 and $46,000 in 1986 and that the source of her income for each year was her employment with Howse.

The employment history described by respondent on her loan application and the supporting documentation she submitted to the lender were false, however. Through a stipulation entered into by the parties, Howse explained that the W-2 withholding statements in question had not been prepared by his office and were not accurate. Howse stated that he did not employ respondent at all in 1985 and that he employed her for only a short time in 1986; Howse said that he paid respondent in cash, and he was unable to recall the amount of her compensation. Respondent, in her own testimony before the Inquiry Board, stated that she did some work for Howse from late in 1986 until October 1987, and that she earned about $1,000 for this work.

Respondent also submitted to Mid-America an employment verification form bearing the purported

signature of Howse. The form stated that respondent was currently employed by Howse, that she earned $46,000 in 1986 from that employment, and that her base pay was $48,000 in 1987. By stipulation, Howse stated that the signature was not authentic and that the verification form did not reflect respondent's employment history. An application for commitment for title insurance submitted by respondent to Mid-America incorporated the same false information regarding respondent's employment and income.

Respondent's loan application also contained an incorrect social security number. Respondent attributed this discrepancy to a clerical error by the lender. Respondent used a different social security number on other documents she prepared in connection with the loan application.

Respondent's loan was subsequently approved, and she took possession of the property on October 28, 1987. On the same day, Mid-America discovered respondent's fraud. Soon after that, an officer of Mid-America told respondent of the lender's intention to exercise its option to declare the full amount of the loan immediately due and payable, though the lender was also willing to refinance the loan if respondent provided a larger down payment. When respondent was unable to tender a satisfactory sum, Mid-America instituted foreclosure proceedings. Judgment in the foreclosure action was entered against respondent on September 6, 1988. The record contains no evidence of the extent of the loss, if any, incurred by Mid-America as a consequence of respondent's actions.

The Administrator's complaint also charged respondent with making false statements on her bar application concerning her name at birth and her social security number. On the application, respondent stated that her name at birth was Michele Elaine Chandler. The

name actually appearing on respondent's birth certificate, however, was Michele Elaine Dickerson. By stipulation, respondent explained that she had never used her father's name, Dickerson, and had instead used her mother's maiden name, Chandler, from the time of her birth.

Respondent also gave an incorrect social security number on her bar application. After inquiry by the Committee on Character and Fitness, she amended her application and provided a different number. Before the Inquiry Board, respondent explained that she had lost track of her original social security number sometime in the 1970s, had reapplied for the number, and had then been issued another number. Respondent used the latter number on the loan application and her original number on the bar application.

In mitigation, the respondent offered evidence of her disadvantaged background. Respondent was born in 1955 and grew up on the west side of Chicago. She had her first child when she was 14 years old. Respondent married in 1971, at the age of 15, and began working to support her family. She had a second child soon after that. Respondent and her husband were separated in 1974 and divorced in 1981. Respondent enrolled at the University of Illinois in Chicago in 1977 and received her bachelor's degree, with honors, in 1980.

Respondent then entered law school at New York University, and she was graduated in 1983. She received her license to practice law in New York the following year. Upon her graduation, respondent worked first as a law clerk for the United States Court of Appeals for the Second Circuit, and later as an attorney for a law firm in New York. She also did work for the National Council of Black Lawyers. There is some dispute in the record concerning the circumstances under which respondent left her employment with the appeals court. In answer

to an inquiry by the Committee on Character and Fitness, a supervisor there stated that respondent was asked to resign; respondent maintained that she left the position voluntarily.[1]

Respondent returned to Chicago in 1986, and she

---

[1]In referring to the circumstances under which the respondent left her position with the Second Circuit, the dissent reads the record selectively, ignoring entirely the explanation provided by the respondent's former supervisor. During its investigation of the respondent, the Committee on Character and Fitness sent a questionnaire to the supervisor, seeking verification of the respondent's employment history and making inquiry regarding the respondent's qualifications. The supervisor answered "no" to the question, "While in your employ was the applicant worthy of trust and confidence?" In response to questions concerning the respondent's honesty, integrity, and conduct, the supervisor attached an explanatory statement. The explanation stated:

"While employed under my supervision as a law clerk for the Court of Appeals for the Second Circuit, Ms. Chandler was asked to resign because she had become actively involved with a team of defense attorneys representing certain defendants then in federal custody. According to prison records and information conveyed to me by a deputy warden Ms. Chandler visited these defendants several times while they were incarcerated in the Metropolitan Correctional Center. She gained access to the prison by claiming to be an attorney for one or more of these defendants. These visits occurred during working hours and without my knowledge or permission. In addition, I was informed by both an assistant United States attorney and a federal magistrate that Ms. Chandler had appeared before the magistrate on behalf of one or more of these defendants, also without my knowledge or permission and also during working hours. Moreover, Ms. Chandler failed to disclose to the prison officials, the AUSAs assigned to the case or to the magistrate that she was a Second Circuit law clerk. Ms. Chandler's activities violated the code of conduct applicable to law clerks employed by the federal courts and demonstrated her lack of candor and integrity.

passed the Illinois bar examination given in February 1987. Respondent initially worked as an attorney for the American Civil Liberties Union; at the time of the hearing, she was employed as an assistant public defender in Cook County. Respondent was admitted to the Illinois bar in April 1988.

Before the Hearing Board, respondent presented favorable testimony from four character witnesses. Weyman Edwards, assistant dean of students at the University of Illinois in Chicago, stated that respondent tutored minority students while she was an undergraduate and that her academic integrity was beyond reproach. Edwards also testified that, prior to the hearing, he was not aware that respondent had submitted false tax documents in support of her mortgage application.

Respondent's uncle, Thomas Chandler, a tactical sergeant with the Chicago police department, also testified in respondent's behalf at the hearing. He stated that respondent has a good reputation for honesty and integrity, has been involved in community service, is a role model for members of her family and for persons in the community, and has expressed remorse for her misconduct.

Two judges of the circuit court of Cook County, Shelvin Singer and Preston Bowie, also testified in respondent's behalf at the hearing. Appearing pursuant to subpoenas issued by respondent, the witnesses stated that respondent, who had practiced in their courtrooms as an assistant public defender, was an able attorney and enjoyed a good reputation for honesty and integrity.

---

Finally, during this time Ms. Chandler was unable to devote her attention to her duties as a law clerk. As a result, her assignments were not completed in a timely fashion or were poorly performed.

In sum, Ms. Chandler's conduct while in the Court's employ demonstrated that she was not worthy of the trust and confidence placed in her by the Court."

Judge Singer described respondent as "the best all around public defender who has been in my courtroom." Prior to the hearing, neither witness was aware that respondent had submitted false tax documents to the mortgage lender.

As further evidence in mitigation, respondent introduced evaluation forms prepared by her supervisor in March and September 1991 concerning her work as an assistant public defender. The evaluations ranged from "Adequate" to "Very Good," and her ethics and integrity were rated as "Outstanding" on both forms.

The Hearing Board filed its report and recommendation on February 10, 1992. The Board found that respondent's preparation and submission of false documents with respect to the mortgage application were intentional and were designed to deceive the mortgage lender into making the loan. The Hearing Board also found that respondent, on her bar application, made materially false statements concerning her social security number and name at birth. In mitigation, the Hearing Board noted that respondent had a good reputation for honesty and integrity in the community and was well regarded as an assistant public defender. The Hearing Board recommended that respondent be suspended from the practice of law for a period of six months.

The Hearing Board had earlier refused to allow the Administrator either to amend the original complaint against respondent or to file an additional one. The Administrator had sought to bring further charges against respondent involving her failure to reveal to the Committee on Character and Fitness both the foreclosure action and her misconduct in obtaining the loan. In its order, the Hearing Board made no findings regarding these additional allegations against respondent.

The Administrator filed exceptions to the Hearing

Board's report, and the matter was submitted to the Review Board on July 10, 1992. The parties specifically agreed that the Review Board, in determining a recommended sanction, could consider the Administrator's additional allegations of wrongdoing by respondent.

The Review Board filed its report and recommendation on May 14, 1993. The Review Board affirmed the factual findings of the Hearing Board, though the Review Board did not find significant respondent's failure to disclose on her bar application her correct name at birth. Despite the parties' agreement, the Review Board, in formulating a recommended sanction, declined to consider the respondent's failure to apprise the Committee on Character and Fitness of the foreclosure action or her misconduct in obtaining the loan. Like the Hearing Board, the Review Board recommended a six-month suspension. The Review Board concluded alternatively that even if the additional violations had been considered, it would not have recommended any greater sanction, for the same type of misconduct had been proved under the original complaint.

At the outset, we agree with the Review Board that respondent's failure on her bar application to accurately state the surname she received at birth was not significant under the evidence presented here. The evidence shows that respondent had never lived with her father, Dickerson, and had used her mother's maiden name, Chandler, since birth. On this record, we conclude that respondent's omission of her father's surname from the bar application was not material.

We do not agree, however, with the Review Board's conclusion that the present disciplinary proceeding may not take account of the additional misconduct committed by respondent in failing to update her bar application with information about the foreclosure action and the circumstances under which she obtained her loan. Al-

though the parties expressly agreed that the Review Board should consider respondent's further misconduct when imposing discipline, the Review Board declined to do so, believing that the additional charges were not properly before it. The Review Board noted that the Hearing Board did not take evidence of those charges, that respondent did not formally admit the allegations, and that respondent successfully moved for dismissal of the Administrator's second complaint, which charged respondent with the additional misconduct. The Review Board also concluded that the present record lacked sufficient evidence regarding respondent's state of mind when she failed to disclose to the committee the pendency of the foreclosure action and the misrepresentations on her loan application.

We share, of course, the Review Board's concern that attorneys receive notice of the charges against them in disciplinary proceedings and have an opportunity to defend against those charges. Generally, an attorney may not be disciplined for instances of uncharged misconduct; to do so would violate the respondent's right to procedural due process and our own notions of candor and fairness. (*In re Doyle* (1991), 144 Ill. 2d 451, 470-71; see also *In re Ruffalo* (1968), 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222.) To that end, Supreme Court Rule 753(b) provides that a complaint in a disciplinary matter "shall reasonably inform the attorney of the acts of misconduct he is alleged to have committed." (134 Ill. 2d R. 753(b).) In the present case, however, respondent has admitted that she had both notice of the additional charges and an opportunity to defend against them, and the parties have agreed that these further instances of misconduct may be considered in the imposition of a disciplinary sanction.

The additional charges are directly related to the allegations in the initial complaint concerning respon-

dent's mortgage loan application and bar application. Respondent submitted her bar application to the State Board of Law Examiners on November 28, 1986. The application was still pending before the Committee on Character and Fitness when, during the period from August to October 1987, respondent was providing the mortgage lender with false information regarding her income and employment history. One of Mid-America's officers confronted respondent with this fraud in November 1987, and respondent was served with summons in the foreclosure action no later than March 27, 1988. Not until April 11, 1988, did an inquiry panel of the committee recommend respondent's certification, and she was admitted to the Illinois bar on April 26, 1988.

The bar application required respondent to "immediately disclose to the Character and Fitness Committee circumstances and events occurring after the date of the submission of [the application] which may have any substantive bearing on Applicant's character and fitness." Thus, respondent was under a continuing duty to provide the committee with further relevant information as it became available. Although respondent was in contact with the committee in January 1988 and again early in April 1988 because of other inquiries relating to her fitness, at no time did she report to the committee either her misconduct in connection with the loan application or the ensuing foreclosure action.[2] As we have stated, the parties agree that these additional acts

---

[2] In addition to the duty of disclosure imposed on an applicant by the bar application itself, Rule 1—101(b) of the Code of Professional Responsibility provides as follows:

"A lawyer is subject to discipline if he has made a materially false statement in, or if he has deliberately failed to disclose a material fact requested in connection with, his application for admission to the bar." (107 Ill. 2d R. 1—101(b).)

of misconduct may be considered in the imposition of a sanction.

We must now determine the appropriate sanction in this case. Attorney disciplinary proceedings are intended to safeguard the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach. (*In re Lenz* (1985), 108 Ill. 2d 445, 450-51; *In re Lamberis* (1982), 93 Ill. 2d 222, 227.) Predictability and fairness require consistency in the sanctions imposed for similar acts of misconduct (*In re Timpone* (1993), 157 Ill. 2d 178, 197; *In re Saladino* (1978), 71 Ill. 2d 263, 275), although each case must necessarily be resolved on the facts and circumstances peculiar to it (*In re Joyce* (1989), 133 Ill. 2d 16, 31; *In re Ushijima* (1987), 119 Ill. 2d 51, 57). The Administrator argues that respondent's misconduct warrants disbarment or, failing that, a lengthy suspension from the practice of law. Respondent contends that the six-month suspension recommended by both the Review Board and the Hearing Board is appropriate. Although we give def-

---

The respondent's bar application expressly requested the following information:

"11. (a) Have you ever been a party (either plaintiff or defendant) to or otherwise involved in any action or legal proceeding, either civil or criminal or quasi criminal, including any proceedings in juvenile court? \*\*\*

If your answer is Yes as to any of the foregoing subparagraphs, state fully all of the facts, \*\*\*. Your answer must fully apprise the Committee of all relevant issues and facts, \*\*\*."

On her bar application, the respondent answered "no" to the inquiry in subparagraph 11(a). For the respondent's failure to update the bar application with information regarding the foreclosure action and the manner in which she obtained the mortgage loan, the Administrator's second complaint charged the respondent with violating Rules 1—101(b), 1—102(a)(4), and 1—102(a)(5) of the Code (107 Ill. 2d Rules 1—101(b), 1—102(a)(4), (a)(5)) and Supreme Court Rule 771 (107 Ill. 2d R. 771).

erence to the sanctions recommended by the Review and Hearing Boards, their recommendations are only advisory (*In re D'Angelo* (1988), 126 Ill. 2d 45, 52-53; *In re Hopper* (1981), 85 Ill. 2d 318, 323), for the final responsibility for imposing discipline upon an attorney rests with us (*In re Williams* (1986), 111 Ill. 2d 105, 115).

With respect to respondent's actions in obtaining her loan, we note that sanctions imposed in cases involving misrepresentations by attorneys have ranged, depending on the circumstances of the case, from censure (see *In re Stern* (1988), 124 Ill. 2d 310 (respondent responsible for preparation of falsely dated letter but stopped short of using letter to own advantage)), to suspension (see *Williams* (respondent convicted on three counts of mail fraud in connection with scheme to defraud insurance company)), to disbarment (see *In re Bell* (1992), 147 Ill. 2d 15 (among other acts of misconduct, respondent filed five false loan applications with banks, testified falsely before Administrator, and submitted false affidavit to Supreme Court of Tennessee)). Moreover, acts of intentional fraud are sufficient grounds for disbarment. (*In re Vavrik* (1987), 117 Ill. 2d 408, 413; *In re Braner* (1987), 115 Ill. 2d 384, 394; *Saladino*, 71 Ill. 2d at 276.) That the present fraud concerns an attorney's personal life rather than professional affairs is of no moment here. The fraudulent act of an attorney acting in his own behalf in which he seeks personal gain, directly or indirectly, to the detriment of honesty, is no less reprehensible than when he acts on behalf of his client. (*Williams*, 111 Ill. 2d at 117.) It is our duty to supervise the professional conduct of lawyers practicing in Illinois, and the fulfillment of that duty necessarily requires inquiry into the private conduct of attorneys to the extent that such conduct relates to professional competence or the dignity of the legal profession. *Lamberis*, 93 Ill. 2d at 227.

474

At the same time, an applicant for admission to the bar of this State has a duty to respond fully and accurately to all questions asked on the bar application. (*In re Ascher* (1980), 81 Ill. 2d 485, 499; *In re Mitan* (1979), 75 Ill. 2d 118, 127.) The absence of candor or completeness exemplifies a lack of concern for the truth and can only frustrate the application process. (*In re De-Bartolo* (1986), 111 Ill. 2d 1, 6.) The failure of an applicant to fully and truthfully respond to these inquiries has been held to be a fraud upon the court, warranting severe disciplinary sanctions. (*Ascher*, 81 Ill. 2d at 499; *Mitan*, 75 Ill. 2d at 127.) Accordingly, an attorney may be disbarred (*In re Jordan* (1985), 106 Ill. 2d 162) or suspended from the practice of law (*In re Connor* (1993), M.R. 8711 (unpublished order)) for false statements made on his or her bar application even though no evidence is adduced concerning any further unprofessional or unethical conduct occurring since the person's admission to the bar. Of course, the duty of candor does not end once the application is submitted; as noted, an applicant has a corresponding obligation to disclose pertinent information to the Committee on Character and Fitness while the application is pending.

Turning now to the respondent's specific instances of misconduct, we conclude that a lengthy period of suspension from the practice of law is both necessary and appropriate in the case at bar. For personal gain, respondent developed and carried out an elaborate scheme intended to induce Mid-America to lend her nearly $85,000 when she was not financially qualified to receive a loan of that size on the terms originally agreed upon. Toward that end, respondent grossly misrepresented to Mid-America her income and employment history. In addition, respondent submitted to the lender false W-2 withholding statements and tax returns and a false employment verification form.

We note that other attorneys who have participated in elaborate fraudulent schemes have received substantial suspensions from the practice of law for their misconduct. (See *In re Sherre* (1977), 68 Ill. 2d 56 (attorney suspended three years for participating in preparation of false documents inflating value of real estate held in trust for client insurance company, resulting in attorney's conviction for mail fraud); *In re Grossgold* (1974), 58 Ill. 2d 9 (attorney suspended three years for participating in preparation and submission of fraudulent bills and inflated subrogation claims by which he gained $586.76 in fees, resulting in conviction for mail fraud); *In re Alschuler* (1944), 388 Ill. 492 (attorney suspended three years for participating in scheme in which he kicked back one half of annual retainer to officer of client company, and for later making false statements to investigators in attempt to conceal scheme).) Like the respondent in the present case, the attorneys in each of the preceding disciplinary matters participated in elaborate schemes to defraud; unlike the present respondent, however, the attorneys in those cases were not the principal architects of the schemes.

During the same period, respondent's application for admission to the Illinois bar was pending. In the application, respondent misstated her social security number, one of two numbers she has used. Such conduct demonstrates respondent's lack of candor and her intention to frustrate the investigation of her qualifications to practice law by the Committee on Character and Fitness. In addition, respondent later failed to inform the committee of both the fraud she committed in obtaining her loan and the lender's ensuing foreclosure action, despite her continuing obligation to apprise the committee of relevant matters bearing on her integrity. Respondent's failure to disclose these important

matters to the committee—matters that would have been grounds for denying her application for admission to the bar—thwarted the committee's assessment of her character and fitness to practice law. See *In re Ascher* (1980), 81 Ill. 2d 485.

In mitigation, we note that respondent has been cooperative throughout these proceedings, has expressed remorse for her misconduct, and has not been the subject of any previous disciplinary action. Further, the evidence fails to show the extent of the loss, if any, incurred by the lender as a result of respondent's actions. Respondent insists that her only purpose in attempting to obtain the loan was to provide safe, affordable housing for her family. We must, however, reject as morally flawed respondent's assumption that the purity of her motive may excuse her misconduct, and as empirically flawed her premise that such housing could not be obtained through honest means.

Finally, respondent points to the evidence of her good reputation for honesty and integrity at work and in the community at large. Several of respondent's character witnesses, however, were not aware of the full extent of her misconduct. Moreover, as this court has observed previously, "While proof of good reputation is always an element to be taken into consideration, it is no defense to specific acts of misconduct. [Citation.]" *In re McCallum* (1945), 391 Ill. 400, 415.

The cases offered by the dissent as a sampling of disciplinary matters are readily distinguishable, involving, in contrast to the present proceeding, different forms of attorney misconduct, substantially greater mitigation, or both. See, *e.g.*, *In re Levy* (1987), 115 Ill. 2d 395, 399 (concluding that respondent did not have intent to defraud); *In re McAuliffe* (1987), 116 Ill. 2d 254, 260-61 (no finding of fraud made by this court, review board, or hearing board; respondent suffering from significant

mental and physical impairments at time of misconduct); *In re Towles* (1983), 98 Ill. 2d 179, 185 (respondent's misconduct was result of ignorance or mistake); *In re Eisenberg* (1984), M.R. 3074 (respondent censured after pleading guilty to providing false information to Internal Revenue Service pursuant to plea agreement in which government acknowledged that respondent did not actually know documents were false and fraudulent); *In re Ring* (1990), 141 Ill. 2d 128 (neglect of legal matter); *In re Hall* (1983), 95 Ill. 2d 371 (neglect); *In re Sims* (1991), 144 Ill. 2d 323 (drug addiction); *In re Scarnavack* (1985), 108 Ill. 2d 456 (drug addiction); *In re Levin* (1984), 101 Ill. 2d 535, 540 (respondent's remarks to clients and other attorneys concerning status of cases were blatant misstatements but not found to be fraudulent); *In re Chapman* (1983), 95 Ill. 2d 484 (alcoholism).

Several other cases cited by the dissent also merit brief comment. In *In re Gabriele & Villadonga* (1992), MR 8236, this court denied the administrator's petition to file exceptions to the report and recommendation of the review board and, in an unpublished order, instead entered an order summarily approving and confirming that report and recommendation. In view of those circumstances, the case possesses little precedential value. In addition, we note that the review board specifically observed that "the criminal acts committed by respondents involved facilitating a scheme that they neither conceived nor disguised from the purchasers" and believed that those circumstances mitigated the attorneys' misconduct. Each of the two attorneys in that proceeding had been practicing law for about 20 years, had a spotless record, and had taken part in *pro bono* activities.

In *In re Cetwinski* (1991), 143 Ill. 2d 396, another case cited by the dissent, the court noted, among other mitigating circumstances, that the attorney in that case

had discontinued his misconduct prior to the investigation by law enforcement authorities, had suggested restitution to the client as part of his Federal sentence, enjoyed an otherwise unblemished reputation, had initiated his own *pro bono* program shortly after his admission to the bar, and cooperated fully with law enforcement authorities in obtaining evidence against, and testifying against, a codefendant. Finally, *In re Armentrout* (1983), 99 Ill. 2d 242, also cited by the dissent, may be an uncertain lodestar in determining disciplinary sanctions. It might be suggested that the two-year suspension imposed on the respondent in that case for forging voters' signatures on petitions for a statewide advisory referendum was too lenient, especially in light of the attorney's subsequent actions during the period of his suspension (see *Cetwinski*, 143 Ill. 2d at 398-402 (describing Armentrout's role in separate misconduct in which Cetwinski was involved)).

Considering both the seriousness of respondent's various acts of misconduct and the mitigating evidence she has offered, we order that respondent be suspended from the practice of law for three years and until further order of this court.

*Respondent suspended.*

JUSTICE McMORROW, dissenting:

I dissent from the majority's decision to suspend respondent from the practice of law for three years and until further order of court. In my opinion, such a sanction is, under the facts of this case, unduly harsh and significantly more punitive than sanctions imposed in other cases for conduct more egregious than the misconduct of which respondent is guilty in the case at bar.

This court's "primary consideration in determining the nature and extent of discipline to be imposed in any particular case is the protection of the public and the

integrity of the profession" (*In re Kramer* (1982), 92 Ill. 2d 305, 311). "The 'public' which is to be protected through disciplinary measures is comprised of the public at large, but primarily consists of those who are directly affected by the attorney's professional conduct." (*In re Towles* (1983), 98 Ill. 2d 179, 185-86.) "In determining the appropriate discipline *** this court should not impose a sanction which will benefit neither the public nor the legal profession." *In re Leonard* (1976), 64 Ill. 2d 398, 406.

Although respondent made a serious error, I believe that the majority's sanction is grossly disproportionate to the sanctions this court has imposed upon other lawyers who have engaged in similar or worse acts of misconduct. Respondent might have fared better before this court if her dishonesty took the form of willfully failing to file tax returns for three years (*In re Towles* (1983), 98 Ill. 2d 179 (censure); lying to clients about the dismissed status of their appeals (*In re Ring* (1990), 141 Ill. 2d 128 (six-month suspension); or falsifying an insurance claim for monetary profit in violation of Federal mail fraud laws (*In re Williams* (1986), 111 Ill. 2d 105 (two-year suspension)). Respondent might have been accorded more lenient treatment if she were a former State's Attorney who abused drugs for years while prosecuting crime (*In re Sims* (1991), 144 Ill. 2d 323 (two-year suspension)); a former prosecutor who masterminded a scheme of voter signature forgery to place a referendum on the ballot (*In re Armentrout* (1983), 99 Ill. 2d 242 (two-year suspension)); a judge who solicited loans from an attorney without disclosing the loans on his declaration of economic interest statement (*In re Witt* (1991), 145 Ill. 2d 380 (six-month suspension)); or even an attorney who loaned money to a judge to influence his decisions (*In re Ketchum* (1988), 124 Ill. 2d 50 (two-year suspension)).

The key focus of this or any disciplinary action must be the imposition of an *appropriate* sanction. This court has stated, "While each case of attorney misconduct is unique and requires an independent evaluation of its relevant circumstances [citation], predictability and fairness require consistency in the sanctions imposed for similar conduct." (*In re Cheronis* (1986), 114 Ill. 2d 527, 535.) Both the Hearing Board and Review Board, after considering all of the evidence, determined that a six-month suspension was the appropriate sanction to impose in this case. I see no reason to depart from that determination. Accordingly, I dissent.

The undisputed facts reveal that respondent, who grew up having little contact with her father, was a child of 14 years when she gave birth to her own child. She married at age 15, began working, and soon had a second child. Respondent and her husband separated after three years, and from that time forward she provided the sole support for herself and her children. Notwithstanding her tremendous obligations she enrolled in college and was graduated, with honors, in three years, from the University of Illinois at Chicago. She then attended New York University School of Law, with an academic scholarship. She gave birth to a third child while in law school. Despite the difficulties of balancing her studies with the travails of single-parent child-rearing, respondent successfully completed law school and obtained her license to practice law in New York. Thereafter, respondent worked for one year as a law clerk for the United States Court of Appeals for the Second Circuit. There she reviewed *pro se* filings and prepared legal memoranda and made recommendations to a judge. The majority opinion refers to a dispute over whether respondent left voluntarily or was asked to leave. This matter was not mentioned in any of the briefs as relevant to the issues involved in this appeal.

In fact, the record reveals that the chairman of the inquiry panel who reviewed both respondent's explanation and her supervisor's view of the circumstances of respondent's leaving "fe[lt] that the response from the employer [was] a matter of overzealousness." The members of the inquiry panel of the Committee on Character and Fitness unanimously voted to recommend respondent's certification to the Illinois bar.

Further, there were many other highly positive responses that were received by the Character and Fitness Committee regarding respondent's application for admission to the Illinois bar. For example, the affidavit of a supreme court justice in New York, for whom respondent performed law clerk services as a "Root-Tilden scholar" in 1981, stated that respondent "ha[d] an impeccable sense of honesty[,] *** the highest degree of morality and integrity[,]" and was never disciplined while in his employ, "only praised." The justice expressed high regard for respondent's intellectual and analytical gifts and her maturity and idealism.

Attorney William Kunstler submitted an affidavit stating that respondent was an intern at his law firm and under his supervision from February 1982 to May 1983. He found respondent "scrupulously honest," with "highest" integrity, and her general conduct "eminently satisfactory." She left his office upon accepting employment with the Second Circuit. In his affidavit he states, "The applicant is an extremely hardworking and socially conscious person. She gives unstintingly of herself, without complaint or excuse. I believe most wholeheartedly that she will be an asset to the Illinois bar."

An affidavit from Lennox S. Hinds of the New York law firm of Steven, Hinds & White, for whom respondent worked as an attorney from January 1985 to July 1986, stated that respondent "could be completely

trusted on all assignments [and] at all times exhibited the highest integrity." Further, "Ms. Chandler conducted herself with the highest degree of professionalism," and was never disciplined while in the firm's employ. She left the firm to relocate in Illinois. Hinds stated his firm could entrust respondent with the "most sensitive matters" and relied on her "highest degree of professionalism" and "enthusiastically" recommended her admission to the Illinois bar. As stated, the members of the inquiry panel of the Character and Fitness Committee voted unanimously to recommend respondent's certification to the Illinois bar.

Before returning to Chicago, respondent worked as a defense lawyer in a Federal case in which she earned a fee of approximately $30,000. At the time respondent falsely represented her salary and employment relationship with Nathaniel Howse, she in fact was working for him on an independent contractor basis. She had worked with Howse on a death penalty case and she anticipated working with him on other matters. She worked for the ACLU for approximately eight months. Her next employment was with the public defender's office, where she was employed at the time of the hearing.

Respondent passed the Illinois bar examination in February 1987. Her admission to the bar was approved in April 1988. In August 1987, respondent applied for a mortgage loan on a home in Chicago, using falsified documents and false information relating to her income and employment status at that time. In her sworn deposition of record, respondent stated that she knew she could afford the payments because she had good, marketable skills and had received a $30,000 judgment for attorney fees. She expressed remorse for her misconduct, realizing that what she did was "terribly wrong" but also that she made every effort not to cause loss to the lender. She maintained the house in good condition for

the short time she was there, secured insurance, and attempted to work out a payment plan with the lender, offering to make two or three payments at a time. Respondent also explained that she believed that the house she purchased for her three children and herself was a necessity, not a luxury item. Her deposition further indicates that she had paid up to $700 in rent for apartments with inadequate heat, and that many landlords would not rent to her because of her children.

Respondent's professed difficulties in obtaining financing for a house do not excuse her misrepresentations to the bank. However, it appears respondent believed she would find adequate employment and she anticipated using the legal fee she had earned in New York to meet her monthly mortgage payments. Although respondent obtained the mortgage loan under false pretenses, it is worthy of note that she did not intend to deprive the bank of its fees, interest, or principal loan amount. *Respondent was not in financial default*; the lender called the loan upon learning of her falsified employment record. Indeed, respondent had tendered the initial mortgage payment, which the lender refused. The lender did not include allegations of fraud in the foreclosure action, which proceeded without contest. Respondent's actions—although designed to induce the mortgage lender to approve her loan through the fabrication of her employment record and income— were not calculated to cheat the mortgage lender of its money and did not result in economic loss to the lender. In fact, the lender was willing to refinance the loan if respondent met its demand for a greatly increased down payment. She was not able to make the substantially increased down payment.

At the disciplinary hearing, respondent presented favorable testimony from four character witnesses. The assistant dean of students at the University of Illinois in

Chicago testified that respondent's academic integrity while an undergraduate student was beyond reproach and that she tutored minority students. Respondent's uncle, a police sergeant, testified that when respondent moved back to Chicago in 1986 she performed community services, particularly with the homeless and senior citizens. He said she was a role model for others in the community, including her niece, who enrolled in law school as a result of respondent's guidance. Both judges who appeared at the hearing gave favorable testimony regarding respondent's professional performance and honesty. Respondent introduced work evaluation forms that her supervisor had completed. These evaluations rated her integrity and professional performance highly.

The Hearing Board characterized respondent's actions as "elaborately designed to deceive Mid-America Mortgage Company" into making the loan. The Review Board also recognized the gravity of respondent's conduct in making intentional and material misrepresentations in her loan application. Nonetheless, the eight members of the Review Board agreed with the three-member panel of the Hearing Board that a suspension of six months was the appropriate sanction under all of the circumstances. I disagree with the majority's decision, which augments the six-month suspension with an additional $2^1/2$ years without citing to any specific facts or cases that might justify the increased penalty, beyond the newly announced sanction for failure to update bar applications.

Although acknowledging respondent's cooperation, remorse, previously clean record, and absence of loss to the lender, the majority denigrates respondent's motive in attempting to obtain the loan, which the majority notes was "to provide safe, affordable housing for her family." The majority concludes, "We must, however, reject as morally flawed respondent's assumption that

the purity of her motive may excuse her misconduct, and as empirically flawed her premise that such housing could not be obtained through honest means." 161 Ill. 2d at 476.

Nothing in the record indicates that either the Hearing Board or Review Board found that her motive *excused* her misconduct. Neither Board took evidence, empirical or otherwise, to determine the ease with which respondent could have obtained adequate housing. Her stated reasons or purpose, in deceiving the mortgage lender, are irrelevant to the initial inquiry into her undisputed violation of the Rules of Professional Conduct. The sole relevance of respondent's explanation of purpose or motive goes to the determination of the appropriate *sanction* to be imposed.

The cases reveal that evidence of motive can be either a mitigating factor (*e.g., In re Walner* (1988), 119 Ill. 2d 511, 525 (censure given to lawyer who settled client's claim without consent and for signing client's name, without authorization, where no prejudice resulted and attorney acted out of a "misguided sense of efficiency")) or a factor in aggravation (*e.g., In re Karzov* (1988), 126 Ill. 2d 33, 43-44 (18-month suspension imposed because respondent's motives in loaning money to Judge Holzer "were designed to influence Holzer in judicial decisions"); *In re Ketchum* (1988), 124 Ill. 2d 50 (two-year suspension of attorney who made repeated loans to Judge LeFevour, then presiding judge of a district in which respondent had numerous cases pending); *cf. In re Corboy* (1988), 124 Ill. 2d 29 (no discipline imposed, in part based on finding that the six respondents lacked improper motives in giving or loaning money to Judge LeFevour, to help pay the medical expenses of the judge's mother)).

Although this court should not overemphasize the significance of an attorney's motive in disciplinary cases,

it is appropriate to ponder which causes greater harm to the public's faith in the justice system: lawyers who give things of value to influence judicial decisions, thereby threatening the integrity of the legal system, or a single-parent lawyer who obtains a home mortgage under false pretenses, to ensure that her family has a decent place to live.

The majority finds it "of no moment" that respondent's misconduct involved her personal life as opposed to her professional duties. (161 Ill. 2d at 473.) I agree that lawyers' conduct in their private lives, to the extent such conduct reflects on their professional integrity and competence, is a legitimate concern of the disciplinary commission and this court. (See *In re Lamberis* (1982), 93 Ill. 2d 222 (censuring attorney who plagiarized, verbatim, more than half of his thesis for an advanced degree in law).) Even though a lawyer's conduct may be violative of the Rules of Professional Conduct, irrespective of whether the misconduct occurs in the lawyer's private life or professional practice, *the degree of harm* to the public and the profession may differ significantly. Attorneys who cheat their clients betray the relationship of trust that is the *sine qua non* of the attorney-client relationship. (See, *e.g.*, *In re Rotman* (1990), 136 Ill. 2d 401, 420 (attorney disbarred after making calculated decision to convert $15,000 from estate of incompetent); *In re Rosin* (1987), 118 Ill. 2d 365 (attorney suspended for two years for inducing client of limited intelligence to invest in company controlled by attorney's close friend, who was a judge); *In re Lewis* (1990), 138 Ill. 2d 310 (attorney disbarred for lengthy pattern of egregious misconduct which extended over seven years and involved five different clients and at least 18 acts of misconduct).) In the instant case, respondent did not take advantage of any client. She did not cause economic loss to her creditor.

The majority opinion, citing *In re Williams* (1986), 111 Ill. 2d 105, 117, states, "The fraudulent act of an attorney acting in his own behalf in which he seeks personal gain, directly or indirectly, to the detriment of honesty, is no less reprehensible than when he acts on behalf of his client." (161 Ill. 2d at 473.) In *Williams*, the attorney's dishonesty in his personal life gained him thousands of unearned dollars that he collected from his own insurance company through a falsified claim that his car had been stolen. After his conviction for mail fraud, the respondent received a two-year suspension from the practice of law that coincided with his service of conditional probation on the Federal conviction.

In the instant case, respondent obtained a mortgage loan under false pretenses, but she remained obligated and willing to repay the loan. In contrast, the respondent in *Williams* participated in an insurance scam in which the company paid out money for a car that had not been stolen. Respondent's personal gain—the ability to obtain financing for a house for her family—differs in kind from that in *Williams*. Nevertheless, the majority of this court imposes on respondent a period of suspension in excess of that given to Williams.

The majority correctly notes that sanctions for violating Rule 1—102(a) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) range from censure to disbarment. Such a statement, while true, is of little assistance in determining what the appropriate sanction should be in a given case. In considering the issue of the proper sanction to be imposed on respondent for her conduct in connection with the mortgage loan, the majority cites two cases in which the sanction for deceit was censure *(In re Stern* (1988), 124 Ill. 2d 310 (falsely dated letter); *In re Lamberis* (1982), 93 Ill. 2d 222 (plagiarism)), one case in which suspension was imposed *(In re Williams* (1986), 111 Ill.

2d 105 (mail fraud conviction)), and three cases of disbarment (*In re Bell* (1992), 147 Ill. 2d 15; *In re Vavrik* (1987), 117 Ill. 2d 408; *In re Braner* (1987), 115 Ill. 2d 384). These latter three cases, resulting in disbarment, illustrate extraordinarily egregious conduct of a type not present in the instant case.

In *Bell*, the respondent was indicted for filing false loan applications with five different banks over a period of more than one year. He pleaded guilty to two counts of a Federal indictment. He also filed a false affidavit before the Supreme Court of Tennessee, in which he concealed that he was licensed to practice in Illinois; this court found the false affidavit to be a fraud on the high court of Tennessee as well as the Illinois Supreme Court. (*Bell*, 147 Ill. 2d at 38.) In addition, the respondent kept thousands of dollars in fees for cases he never pursued and let at least one criminal appeal be twice dismissed for want of prosecution. This court observed:

> "[The] respondent seriously neglected the cases of seven clients, three of which were criminal cases. \*\*\* Furthermore, many of respondent's clients in the civil cases were prejudiced by respondent's neglect [because their cases were dismissed and their claims consequently time-barred]. \*\*\*
>
> Moreover, all of the client-complainants in this case were repeatedly misled by respondent concerning the status of their cases. \*\*\*
>
> Finally, respondent gave a false written response to the Administrator in regards to [a client's] complaint. Respondent repeated this false response in his sworn statement before the Administrator." *Bell*, 147 Ill. 2d at 39.

In *Vavrik*, the respondent, president of a title insurance company, converted escrowed fees belonging to clients for his own use and was convicted of grand theft. He and his partner, the owner of the title company, collected and deposited money in the company's escrow account and then wrote checks to fictitious payees,

forged the payees' signatures, and endorsed and cashed the checks. In this manner, more than $53,000 was misappropriated. Respondent also gave false testimony in the disciplinary hearings in which he was disbarred.

In *Braner*, an attorney was disbarred for defrauding his client's mentally incompetent wife, to whom the attorney owed a fiduciary duty as a former employee of the bank that was the conservator of her estate. The attorney also defrauded the Department of Public Aid and the courts in both the probate proceedings in which the wife was declared mentally incompetent and the court in which respondent obtained the dissolution of the wife's marriage, which left her without income or assets.

Without describing the factual context in which the above three cases were decided, the majority in the case at bar cites these cases for the principle that "acts of intentional fraud are sufficient grounds for disbarment." (161 Ill. 2d at 473.) In the instant case, respondent's acts, though intentional, are not even remotely comparable to the cited disbarment cases. Therefore, the majority's general citation to such cases is of limited avail.

The number of attorney disciplinary cases precludes a comprehensive listing, in this dissent, of the severity of sanctions imposed on attorneys for deceitful conduct. However, a sampling of cases reveals that many attorneys charged with dishonest conduct have received significantly lesser penalties than that imposed in this case. Censure, rather than suspension, has been imposed in cases of intentional or knowing deceit where the "actual harm" resulting is considered slight. For example, this court censured an attorney who knowingly negotiated a settlement check containing a forged endorsement. (*In re Levy* (1987), 115 Ill. 2d 395.) In *Levy*, this court stated that "no harm was done" because the client's husband admittedly lacked a legal interest in

the settlement proceeds and the insurance company that issued the check suffered no loss; such absence of harm was a "significant consideration" in determining the sanction. (*Levy*, 115 Ill. 2d at 400.) In the instant case there is no suggestion that the lender was economically harmed. Respondent forfeited her $5,000 down payment and did not contest the foreclosure action.

In *In re McAuliffe* (1987), 116 Ill. 2d 254, a former judge was merely censured after being charged with conduct involving fraud, deceit, misrepresentation, prejudice to the administration of justice, moral turpitude, and false statements with the intent to obstruct an inquiry. The charges stemmed from the respondent's settlement of a fee dispute with another attorney, respondent's former business partner. To settle, respondent agreed to recant his prior sworn testimony against the other lawyer before the ARDC. The Hearing Board recommended reprimand in light of substantial mitigating circumstances involving the respondent's extreme mental and physical impairment at the time of the incident. The Review Board recommended a six-month suspension. This court chose censure as the appropriate sanction, noting that although the intentional recantation of sworn testimony in exchange for financial gain could not be justified, respondent's misconduct did not result in any "real harm." (*McAuliffe*, 116 Ill. 2d at 262.) The court also took note of the mitigating circumstances, including the respondent's impairment and subsequent rehabilitation, his unblemished record, and the testimony of character witnesses.

In the instant case, respondent was not suffering from the type of physical and mental breakdown that provided the basis for the minimal sanction in *McAuliffe*. Nevertheless, respondent's freedom from disabilities should not be the factor that distinguishes her three-year suspension from McAuliffe's censure. Respondent

also had an unblemished record and character witnesses and it would appear that her misconduct resulted in no more "real harm" than did McAuliffe's.

Censure has been imposed in cases involving willful failure to file Federal tax returns. (*E.g., In re Towles* (1983), 98 Ill. 2d 179 (court censured an attorney convicted of willful failure to file Federal income tax returns for three years; respondent had a history of *pro bono* and community work and court noted that respondent's misconduct was caused by either negligence or ignorance). See also *In re Eisenberg* (1984), M.R. 3074 (attorney censured after pleading guilty to providing false information to the Internal Revenue Service).) Is the criminal conviction for furnishing false information to the Internal Revenue Service less reprehensible than furnishing false information to a bank?

A suspension of five months was imposed on two attorneys who, like respondent in the instant case, provided false information to a bank to obtain a loan. (*In re Gabriele & Villadonga* (1992), MR 8236.) There is no evident justification for this court to impose a three-year suspension and until further order of court on respondent, in the instant case, and only a five-month suspension on the two lawyers in *Gabriele & Villadonga*.

In other cases, brief suspensions have been ordered where attorneys compounded their neglect of criminal appeals with affirmative misrepresentations to clients or cover-ups of their misconduct in disciplinary hearings. *In re Ring* (1990), 141 Ill. 2d 128 (six-month suspension for abandoning criminal appeal, which was dismissed, and then misrepresenting the status of the case to the client); *In re Hall* (1983), 95 Ill. 2d 371 (three-month suspension for lawyer who failed to pursue criminal appeal, which was dismissed, and then lied about it under oath to the ARDC).

An Illinois attorney who served as consul general to

the Republic of Iceland received a six-month suspension for repeatedly deceiving his co-counsel about receipt of a settlement in which they were to share. The respondent deposited the check into the consular account of Iceland, out of reach of the clients' creditors and respondent's co-counsel, and "stubborn[ly] insist[ed]" on "impeding the disciplinary" proceedings brought by the ARDC. (*In re Johnson* (1989), 133 Ill. 2d 516, 536.) The court stated it was not imposing a more severe sanction because of the respondent's 42 years of practice with "an otherwise unblemished record." *Johnson,* 133 Ill. 2d at 537.

Another category of cases, in which longer suspensions have been given, involves an abuse of the public trust by attorneys charged with enforcing the criminal laws. A Kane County State's Attorney who organized a massive forgery of signatures on a voters' referendum petition was suspended from the practice of law for two years. (*In re Armentrout* (1983), 99 Ill. 2d 242.) Notably, the court imposed far lesser sanctions on the attorneys who assisted him in forging voter signatures; his chief assistant was suspended for six months and a second assistant State's Attorney and two attorneys in private practice were censured. *Armentrout,* 99 Ill. 2d at 254-56.

The State's Attorney of Perry County was suspended for two years for his open use of cannabis and cocaine during his five years as a prosecutor. (*In re Sims* (1991), 144 Ill. 2d 323.) He resigned from his office in exchange for authorities' agreement not to indict him. *Cf. In re Scarnavack* (1985), 108 Ill. 2d 456 (censure imposed on attorney convicted of a count of possession of cocaine; mitigation included respondent's remorse, finding that the crime was an isolated incident, and testimony of character witnesses).

Neither Armentrout nor Sims, prosecutors who abused the public trust, received as harsh a sanction as does respondent in the instant case.

The majority cites three cases in which suspensions of three years were imposed on attorneys who participated in elaborate conspiracies to defraud. (*In re Sherre* (1977), 68 Ill. 2d 56; *In re Grossgold* (1974), 58 Ill. 2d 9; *In re Alschuler* (1945), 388 Ill. 492.) According to the majority, the conduct of the attorneys in these cases resembles that of respondent in the instant case because each attorney participated in "elaborate schemes to defraud," but "unlike the present respondent ***, the attorneys in those cases were not the principal architects of the schemes." (161 Ill. 2d at 475.) Notably, Sherre and Grossgold were convicted of mail fraud for their roles in extensive conspiracies involving insurance companies and conversion of funds. Alschuler participated in a scheme of five years duration, in which he agreed to "kick back" half of his annual retainer paid by public utilities so that officials of the utilities could set up a secret fund, concealed on the books and records, for their own use. Unlike respondent, all three of the disciplined attorneys used their profession to advance illegal schemes. Sherre and Alschuler did not express remorse or any indication they had done anything wrong. In all three cases, the respondents' conduct was on a scale significantly more extensive than that of respondent in the case at bar.

My research has revealed relatively few disciplinary suspensions of three or more years duration. One example in which a three-year suspension was imposed illustrates conduct far more egregious than that of respondent in the instant case. In *In re Cetwinski* (1991), 143 Ill. 2d 396, the respondent participated in an elaborate conspiracy in which he paid kickbacks to a nonattorney and "referral fees" to a suspended attorney in exchange for remaining on the payroll of the Village of Streamwood. The scheme began when respondent's former supervisor, an attorney who was suspended for

organizing a massive voter referendum forgery (see *In re Armentrout* (1983), 99 Ill. 2d 242), offered to assist respondent become employed as labor attorney for the Village of Streamwood, provided that the respondent pay Armentrout one-third of his legal fees as a referral fee. The respondent agreed, and billed the Village without disclosing his fee-sharing arrangement with the suspended lawyer. Within a few months the manager of the Village of Streamwood suggested that he, too, should be receiving compensation, and the respondent began to make political contributions to the manager. Finally, after consulting with Armentrout, the respondent began to bill the Village for fictitious monthly meetings with the manager, as a way of making additional payments to the manager.

Upon being contacted by a Federal agent who was investigating the Village manager, the respondent lied about the purpose of his payments to the manager. He also issued a press release containing false statements. Eventually, the respondent cooperated with the Federal agents and pleaded guilty to charges of conspiracy to make unlawful payments to the village official and falsely claiming the unlawful payment as a business deduction on his income tax return. *Cetwinski,* 143 Ill. 2d at 402-03.

This court recognized that the respondent's misconduct was similar to that in which other attorneys had been disbarred (see *In re Rosenthal* (1978), 73 Ill. 2d 46) but determined that the mitigating evidence supported a three-year suspension instead, retroactive to the date on which the respondent had been suspended on an interim basis. Mitigating factors included his performance of *pro bono* services for senior citizens and the fact he was distraught by the failure of his marriage of 10 years at the time he was engaging in the payments to the Village manager.

In *Cetwinski*, the respondent received a three-year suspension for abetting official corruption and inflating his billings over a period of months, and then giving Federal investigators false statements to cover up his conduct and issuing a false press release. The scope and harm of Cetwinski's misconduct unquestionably exceeded that found in the instant case.

The majority in the instant case reviews respondent's actions in connection with the loan and imposes a suspension of three years *and until further order of this court.* Under the "until further order of this court" provision, respondent will be forced to take additional measures and undergo the time and expense of further proceedings before she can reclaim her law license. It is difficult to discern the manner in which the majority applies the basic principle, "[p]redictability and fairness require consistency in the sanctions imposed for similar acts of misconduct." 161 Ill. 2d at 472.

This court imposed a three-year suspension in another case involving a long-term scheme of official corruption and improper payments. (*In re Leonard* (1976), 64 Ill. 2d 398.) In *Leonard,* respondent and others were the subjects of a 21-count indictment which included charges of knowing and willful conspiracy to use the mail to promote bribery and the assistance in the preparation of fraudulent Federal corporate income tax returns. The respondent was the attorney, corporate secretary, director, and consultant to a company set up to funnel bribes to Paul Powell, then Illinois Secretary of State, in exchange for a license plate manufacturing contract. The court noted that the respondent's "actions were not merely an isolated aberration but a knowing and wilful participation in the bribery of a State official, which continued over a period of one year." (*Leonard,* 64 Ill. 2d at 404.) In the instant case, respondent's actions in connection with her loan lack the scope and

severity of the *Leonard* respondent's conspiracy to commit bribery and official corruption. See also *In re Levin* (1984), 101 Ill. 2d 535, where this court imposed a three-year suspension on a previously disciplined attorney whose repeated acts of fraudulently concealing his neglect of clients' cases caused "irreparable injury" to several clients. In the instant case, respondent's actions did not cause injury to clients and she has not been involved in prior disciplinary proceedings.

In *In re Chapman* (1983), 95 Ill. 2d 484, the attorney deceived a client by repeatedly lying about the status of the client's neglected appeal. This court imposed a two-year suspension, stayed pending probation, after finding that the respondent had been rehabilitated from his abuse of alcohol. This court rejected the recommendation of the Hearing and Review Boards that the previously disciplined attorney should be disbarred, concluding that the "drinking problem which formerly existed [was] asserted to be under control" and the respondent was making restitutionary payments to the client. *Chapman,* 95 Ill. 2d at 494.

Recently, this court was asked to consider whether probationary suspension under Supreme Court Rule 772 should be extended to an attorney who did not suffer from a disability. (*In re Jordan* (1993), 157 Ill. 2d 266.) In *Jordan,* the respondent forged the release of a hospital lien in order to expedite the payment to a client of settlement funds. The respondent then attempted to conceal his misconduct by making false statements repeatedly to the Attorney Registration and Discipline Commission. (*Jordan,* 157 Ill. 2d at 270.) This court noted that the imposition of probation traditionally has been reserved for lawyers whose misconduct is related to a disability such as substance abuse or mental illness. However, in *Jordan,* we acknowledged that the respondent was not acting under a disability, but nonetheless

determined that his three-year suspension should be stayed during a contemporaneous period of conditional probation. This court observed that the respondent's forgery had not been motivated by personal gain and that his errors in judgment were "an isolated incident" in an otherwise "exemplary" career, which included community activities and *pro bono* legal work. *Jordan*, 157 Ill. 2d at 276-77.

As the record in the instant case reveals, respondent's drive and hard work propelled her from a difficult childhood and early motherhood to an exemplary record of distinguished educational performance and a professional career largely devoted to public service rather than personal enrichment. Her misconduct appears to be an isolated incident. Although respondent had no mental or substance abuse impairment, she may be the victim of her own strength: ironically, she might have been permitted to continue the practice of law under *Chapman* and *Jordan,* if only she had been a weaker vessel. The majority's imposition of a grossly disproportionate sanction is unfair and serves no public interest.

In finding that "a lengthy period of suspension from the practice of law is both necessary and appropriate in the case at bar" (161 Ill. 2d at 474), the majority relies heavily on the fact that respondent failed to update her application to the State Board of Law Examiners to confess that she made false statements and submitted falsified documents to the mortgage lender in support of her loan application. The majority holds that respondent violated "a continuing duty" to provide the Character and Fitness Committee with relevant information as to her fitness while her application was pending. The origin of this duty is found in a provision of the bar application form itself.

While I agree that candidates for admission to the State bar are required to disclose to the Character and

Fitness Committee anything that bears on their honesty and fitness to practice law, I believe that the majority's reliance on a duty of confession is misplaced. In my view, the proper focus is respondent's deceit to the bank, which is the essential wrongdoing in this case. In activating a duty to update bar applications, the majority fashions two offenses out of the same misconduct and greatly enhances the sanction recommended by both the Hearing and Review Boards.

After the Administrator filed the original charges against respondent, the Administrator filed a separate complaint concerning her failure to disclose her misconduct to the State Board of Bar Examiners. This second complaint was dismissed on respondent's motion, without a hearing or the filing of a responsive pleading. At the disciplinary hearing on the original charges, the Administrator moved for a continuance, asking to amend the original complaint to include the allegations of respondent's failure to disclose her misconduct to the State Board of Bar Examiners. The Hearing Board denied the Administrator's motion for a continuance and leave to amend.

The Review Board upheld the Hearing Board's ruling on the motion and noted that there was never a formal hearing on those allegations. The Review Board also observed that the Administrator's motion for continuance and for leave to amend was tardy because it was made on the day of the hearing, when respondents' witnesses were present and prepared to testify. Finally, the Review Board held that the Administrator should not be permitted to proceed against respondent in a piecemeal fashion, carving two disciplinary actions out of the same conduct.

Significantly, the Review Board concluded that even if the additional charges against respondent had been presented to the Hearing Board and properly preserved

for review, the Review Board would not have recommended any greater sanction for the same conduct that had been proved under the original complaint.

The majority opinion discloses that the majority "share[s] *** the Review Board's concern" that attorneys receive notice and an opportunity to be heard on charges brought against them in disciplinary proceedings. However, the majority states that "the parties have agreed that these *further* instances of misconduct may be considered in the imposition of a disciplinary sanction." (Emphasis added.) (161 Ill. 2d at 470.) This remark by the majority indicates that respondent has waived any objection to the consideration of the additional charges in this court's determination of the proper sanction. I believe the majority distorts respondent's position. In her brief she argues that the Review Board considered, and correctly resolved, the issue of whether her sanction should be increased by crafting two charges out of the same conduct. She does not concede that she should be twice disciplined for the same misconduct.

Notably, the majority does not cite a single case in which another attorney in this State has been adjudicated in violation of the continuing duty to update a pending bar application. The majority cites to Rule 1—101(b), which subjects attorneys to discipline if they deliberately fail to disclose material facts in their bar applications. However, in the instant case respondent completed and submitted her bar application form in December of 1986, many months before she applied for the mortgage loan. Therefore she was truthful on her bar application form when she responded in the negative to whether she had been a party to litigation. What she failed to do is update her bar application contemporaneously with her falsification of loan application documents or at any time thereafter. It is this violation

of the "continuing duty to update" her bar application upon which the majority rests much of its reasoning. Although the majority's position may be technically accurate, I believe it is unfair to single out respondent for a greatly enhanced sanction because of this court's recognition of the heretofore unannounced violation based on a duty to update bar applications.

In one of a series of disciplinary cases that involved attorneys' "loans" or "gifts" to judges, this court discharged six attorneys from discipline after finding, "[A]s in the cases of respondents Corboy, Maddux, Harte and Madler, respondents Tuite and Banks were sailing in uncharted waters." (*In re Corboy* (1988), 124 Ill. 2d 29, 49 (*per curiam*).) This court held that respondents had technically violated the rule prohibiting the giving or lending things of value to a judge. However, this court also concluded that there was little precedent or settled opinion to guide these men in their conduct and therefore it would be wrong to discipline them.

In the case at bar, respondent's failure to update her bar application appears as "uncharted" in our precedents as the *Corboy* respondents' conduct. Care should be taken not to create even the appearance of a double standard in announcing new constructions of ethical requirements.

Respondent had taken the bar examination and submitted her application to the Illinois bar long before she took the unfortunate road that led to the mortgage loan problem. In a period of months she had moved back to Chicago, sat for the bar exam, looked for employment, and searched for decent housing for her family, apparently with limited success. This is not a case in which a bar applicant furnishes false or incomplete information of a material nature on her application form at the time she submits it or in response to additional questioning. Therefore, the cases cited by the majority are not

directly supportive of the heightened sanction the majority imposes for violation of the duty to update. Moreover, the cases that the majority cites in support of the duty to update the bar application information involve circumstances, unlike those in the case at bar, in which the court found a pattern or calculated effort to frustrate meaningful examination of the applicants' fitness to practice law. See *In re Mitan* (1979), 75 Ill. 2d 118 (where the applicant's "extensive pattern of falsehoods and deception pervad[ed]" his statements to the Character and Fitness Board; respondent's deceptions included concealment of his conviction of a felony arising out of a confidence game and several arrests); see also *In re Jordan* (1985), 106 Ill. 2d 162 (respondent, a former police officer, failed to disclose that he had been disciplined numerous times while an officer, had been discharged from the police department for pointing a gun at a man's head and then beating him, had received 297 parking tickets, and was the subject of a bankruptcy foreclosure); *In re Ascher* (1980), 81 Ill. 2d 485, 499 (respondent failed to disclose lawsuit pending against him in which he was accused of forgery, fraud, and abuse of fiduciary duties to clients).

Unlike the attorneys in the above cases, respondent's history and accomplishments suggest that her lapse of judgment and honesty in connection with her mortgage loan is limited to this single incident, which should not disqualify her from continuing to practice as a competent and committed lawyer in this State.

In conclusion, I note that the overriding purpose of our disciplinary system is to protect the public, protect the integrity of the legal system, and to insure the administration of justice. (*E.g., In re Lewis* (1990), 138 Ill. 2d 310, 334-35.) Disparate and inconsistent sanctions cast doubt on the efficiency and the basic fairness of the disciplinary system. (See ABA Model Standards for

502

Imposing Lawyer Sanctions, ABA/BNA Lawyers' Manual on Professional Conduct (1992).) The Hearing Board is in the best position to weigh the evidence and its factual determinations are to be given substantially the same weight as those of other fact finders. (*E.g., Lewis*, 138 Ill. 2d at 334-35.) The Review Board in the instant case concurred in the Hearing Board's assessment of the case, after reviewing relevant precedent. I agree with these Boards that respondent should be suspended for six months from the practice of law. This court's drastic departure from the findings and reasoning of both Boards infuses the attorney disciplinary process with arbitrariness.

For all of these reasons, I respectfully dissent.

JUSTICE FREEMAN joins in this dissent.